## MULLANEY, COMMISSIONER OF TAXATION OF THE TERRITORY OF ALASKA, v. ANDERSON ET AL.

No. 329. Argued January 7–8, 1952.—Decided March 3, 1952.

*J. Gerald Williams,* Attorney General of Alaska, argued the cause for petitioner. With him on the brief were

*John. H. Dimond,* Assistant Attorney General, and *Harold J. Butcher,* Special Assistant Attorney General.

*Carl B. Luckerath* argued the cause for respondents. With him on the brief was *Wheeler Grey.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The Territorial Legislature of Alaska provided for the licensing of commercial fishermen in territorial waters, imposing a $5 license fee on resident fishermen and a $50 fee on nonresidents. Alaska Laws, 1949, c. 66. The Alaska Fishermen's Union and its Secretary-Treasurer, on behalf of some 3,200 nonresident union members, brought this action in the District Court of the Territory to enjoin the Tax Commissioner from collecting the license fee from nonresidents. Plaintiffs contended that the Territorial Legislature was without power under the Organic Act to pass the statute, that the exaction complained of unconstitutionally burdens interstate commerce, and that it is an abridgment of the privileges and immunities of citizens of other States forbidden by Art. IV, § 2 of the Constitution and by the Fourteenth Amendment. After trial, the District Court concluded that the differential between resident and nonresident fees rests on substantial differences bearing a fair and reasonable relation to the objects of the legislation, and upheld the statute. 91 F. Supp. 907. The Court of Appeals for the Ninth Circuit reversed, one judge dissenting. 191 F. 2d 123. We brought the case here for clarification of the limits on the power of the Territorial Legislature. 342 U. S. 865.

Here, for the first time, petitioner questioned the standing of respondent union and its Secretary-Treasurer to maintain this suit. To remove the matter from controversy, respondent moved for leave to add as parties plain-

tiff two of its members, nonresidents of Alaska and subject to the statutory exaction. Rule 21 of the Federal Rules of Civil Procedure authorizes the addition of parties "by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." The original plaintiffs alleged without contradiction that they were authorized by the nonresident union members to bring this action in their behalf. This claim of authority is now confirmed in the petition supporting the motion to add the member-fishermen as plaintiffs. To grant the motion merely puts the principal, the real party in interest, in the position of his avowed agent. The addition of these two parties plaintiff can in no wise embarrass the defendant. Nor would their earlier joinder have in any way affected the course of the litigation. To dismiss the present petition and require the new plaintiffs to start over in the District Court would entail needless waste and runs counter to effective judicial administration—the more so since, with the silent concurrence of the defendant, the original plaintiffs were deemed proper parties below. Rule 21 will rarely come into play at this stage of a litigation. We grant the motion in view of the special circumstances before us.

In *Toomer* v. *Witsell*, 334 U. S. 385, the Court held that Art. IV, § 2 of the Constitution would bar any State from imposing the license fee here attacked. In that case it was said: "The State is not without power, for example, to restrict the type of equipment used in its fisheries, to graduate license fees according to the size of the boats, or even to charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay." *Id.*, at 398–399. The challenged discrimination does not come within any of these exceptions. The Tax Commissioner relied on the higher cost of enforcing the license law against non-

resident fishermen to justify the difference in fees, and the District Court found that 90% of the cost of enforcement was incurred in collecting the fees from nonresidents. But there is no warrant for the assumption that the differential in fees bears any relation to this difference in cost, nothing to indicate that it "would merely compensate" for the added enforcement burden. Indeed the Tax Commissioner and his Special Deputy Enforcement Officer specifically disclaimed any knowledge of the dollar cost of enforcement. What evidence we have negatives the idea of any such relation, for the total amount payable by nonresident fishermen in 1949–1950, in excess of what they would have been charged if they had been residents, may easily have exceeded the entire amount available for administration of the Tax Commissioner's office in that year.[1] Constitutional issues affecting taxation do not turn on even approximate mathematical determinations. But something more is required than bald assertion to establish a reasonable relation between the higher fees and the higher cost to the Territory. We do not remotely imply that the burden is on the taxing authorities to sustain the constitutionality of a tax. But where the power to tax is not unlimited, validity is not established by the mere imposition of a tax. In this case, respondents negatived other possible bases raised by the pleadings for the discrimination, and the one relied on by the Commissioner, higher enforcement costs, was one as to which all

---

[1] The appropriation for the office of Tax Commissioner for the biennium beginning April 1, 1949, was $500,000. Alaska Laws, 1949, c. 114. The District Court found that there were approximately 3,200 nonresident fishermen who were members of plaintiff union, and the court below added that it might be inferred from the record that an equal number of nonresident fishermen were not members of this union. 191 F. 2d at 134. The $45 differential paid by nonresidents multiplied by the 6,400 nonresident fishermen amounts to $288,000, well over half the Commissioner's biennial appropriation.

the facts were in his possession. Respondents sought to elicit these facts by interrogatories and cross-examination without avail. Under the circumstances we think they discharged their burden in attacking the statute.

But, it is urged, Alaska is not a State but a Territory to which the controlling constitutional limitations laid down in *Toomer* v. *Witsell, supra,* are not applicable. *Haavik* v. *Alaska Packers Assn.,* 263 U. S. 510, is invoked for that contention. We have no occasion here to reconsider the constitutional holding of that case, namely, that it is within the power of Congress to relieve the Territory of some of the restrictions applicable to a State. But that in fact was the real issue to which the Court's attention was directed in the *Haavik* case. It was assumed that if Congress had the power it was exercised by the Organic Act. On fuller consideration, in light of the briefs and record in that case and the implications of subsequent Congressional enactments,[2] we cannot so read the

---

[2] After the decision in the *Haavik* case Congress passed the White Act, 43 Stat. 464, 48 U. S. C. §§ 221–247, comprehensively regulating "the fisheries of the United States in all waters of Alaska" and delegating authority to the Secretary of Commerce (now to the Secretary of Interior) to administer the law. That Act provided ". . . no exclusive or several right of fishery shall be granted [in reserved fishing areas established by the Secretary in Alaskan waters], nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of the Interior." 43 Stat. 464, as amended, 48 U. S. C. § 222. But see 43 Stat. 464, 467, 48 U. S. C. § 228, which provides that nothing in the Act "shall abrogate or curtail the powers granted the Territorial Legislature of Alaska to impose taxes or licenses . . . ."

In 1947, Congress amended the Organic Act of Puerto Rico to provide: "The rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States." 61 Stat. 772, 48 U. S. C. § 737. In

Act. Section 3 provides "The Constitution of the United States, and all the laws thereof which are not locally inapplicable, shall have the same force and effect within the said Territory as elsewhere in the United States." 37 Stat. 512, 48 U. S. C. § 23. And § 9 extends the legislative power of the Territory to "all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States, . . . ." 37 Stat. 512, 514, 48 U. S. C. § 77. In the light of these sections, we cannot presume that Congress authorized the Territorial Legislature to treat citizens of States the way States cannot treat citizens of sister States. Only the clearest expression of Congressional intent could induce such a result. It is not present. If anything, Congressional pronouncements since *Haavik* concerning the very subject matter here in issue fortify the conclusion that the Territorial Legislature, particularly in the regulation of fisheries, was granted no greater power over citizens of other States than a State legislature has. The judgment must be

*Affirmed.*

THE CHIEF JUSTICE, MR. JUSTICE CLARK, and MR. JUSTICE MINTON would reverse for the reasons given in points A and B of the dissenting opinion of Chief Judge Denman, 191 F. 2d 123, 134–137.

---

statement explaining the bill, Senator Butler, the manager of the bill, said, "Congress has not expressly extended the Constitution to Puerto Rico, as it did in the case of Alaska and Hawaii, and the committee considered it advisable to bring Puerto Rico expressly within the operation of the comity clause so as to leave no doubt that there may be no discrimination against citizens of the United States who are not residents of Puerto Rico." 93 Cong. Rec. 10402. The report of the Senate Committee on Public Lands expressed dissatisfaction that "Legislation in Puerto Rico has discriminated against nonresident American citizens." S. Rep. No. 422, 80th Cong., 1st Sess. 4.