Joseph BERTRAND, et al., Petitioners,

v.

Charles C. SAVA, et al., Respondents.

Laissez-Moi VIGILE, et al., Petitioners,

v.

Charles C. SAVA, et al., Respondents.

Nos. 81 Civ. 7371, 81 Civ. 7372.

United States District Court,
S. D. New York.

April 5, 1982.

See also, D.C., 535 F.Supp. 1002.

---

Stanley Mailman, Arthur C. Helton, Deborah C. Prosser, Mailman & Ruthizer, George Cooper, Harriet Rabb, Susan D. Susman, Immigration Law Clinic, Steven R. Shapiro, New York Civil Liberties Union, New York City, for petitioners.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for respondents; Thomas H. Belote, Sp. Asst. U. S. Atty., Harvey J. Wolkoff, Asst. U. S. Atty., New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

In an opinion dated March 5, 1982, familiarity with which is assumed, the court found that by discriminating against eight Haitian applicants, respondent Sava failed to exercise properly his discretionary authority to grant parole to excludable aliens. Respondent was given 10 days to demonstrate how any or all of the petitioners pose a risk of absconding different from the risk presented by similar aliens paroled by Sava. He was instructed to scrutinize petitioners under the guidelines with which other ·aliens were treated.

During the 10-day interim, petitioners brought by order to show cause a motion to amend the petition by adding class action allegations, to certify the proposed class and for summary judgment on behalf of the class. All Haitians transferred from Miami to the SPC on July 18, 1981 and who remain in respondent's custody fall within petitioners' class definition. At a March 12 hearing, the court set a briefing schedule and announced that the class issues and the government's response to the original order would be considered simultaneously.

## THE MOTION TO AMEND

Petitioners assert that their amended petition is permitted by Rule 15(a), F.R.Civ.P., and mandated by Rule 15(b). Respondent labels Rule 15(a) amendment untimely and prejudicial, but takes no position with respect to Rule 15(b).

■ Rule 15(a) allows amendment "by leave of court" at any time during the course of litigation. *See Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (amendment allowed after judgment entered dismissing the complaint); *Clay v. Martin,* 509 F.2d 109 (2d Cir. 1975); Wright & Miller, *Federal Practice & Procedure: Civil* §§ 1484, 1488 (1971). Such leave "shall be freely given when justice so requires." Rule 15(a), F.R.Civ.P. This mandate is to be heeded in the absence of certain exigent circumstances—"undue delay, bad faith or dilatory motive on the part

of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , etc." *Foman v. Davis, supra* at 182, 83 S.Ct. at 230.

Delay alone cannot defeat a Rule 15(a) motion to amend. *International Bank v. Price Waterhouse & Co.,* 85 F.R.D. 140, 142 (S.D.N.Y.1980) (Lasker, J.); *Bernstein v. National Liberty International Corporation,* 407 F.Supp. 709, 714 (E.D.Pa.1976) (eight month delay before moving to add class action allegations is not a ground for denying motion to amend). Opposition to such a motion must focus instead on any prejudice that would accrue if it were granted. *Bernstein, supra* at 714. Thus, where class plaintiffs sought to amend their complaint to add an "inherently distinct" class which would "unjustifiably interject entirely disparate issues into and tend to obfuscate" the main lawsuit, the liberality of Rule 15(a) was overcome. *Woe v. Mathews,* 408 F.Supp. 419, 429–31 (E.D.N.Y. 1976), *aff'd,* 562 F.2d 40 (2d Cir. 1977), *cert. denied,* 434 U.S. 1048, 98 S.Ct. 895, 54 L.Ed.2d 799 (1978). Similarly, after 5 years of litigation, and on the eve of settlement, amending a derivative action to include class action allegations "would dramatically alter the nature of th[e] lawsuit, [and] create unfair surprise to all of the Defendants." *Clark v. Lomas & Nettleton Financial Corporation,* 79 F.R.D. 641, 647–8 (N.D.

Tex.1978), *vacated and remanded,* 625 F.2d 49 (5th Cir. 1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1738, 68 L.Ed.2d 224 (1981). Justice did not require the amendments sought in either case.

Transforming an individual action into a class action does not, in and of itself, create the type of prejudice sufficient to deny a motion to amend. *See Bernstein, supra* at 714. Moreover, the instant motion suggests none of the indicia of prejudice which have resulted in denials of leave to amend. While the case is in an advanced procedural posture, it is only four months old. Throughout its short lifetime, both sides have cooperated admirably with an expedited schedule, managing to produce masses of paperwork while attending ongoing hearings. This history belies any claim of bad faith or dilatory motive on petitioners' part, and no such allegation is made.

Nor can respondent contend that a class action will present it with issues not involved in the original lawsuit. Much of the evidence introduced at the evidentiary hearing related to all 86 Haitians transferred from Florida to the SPC in Brooklyn. Statistics concerning the entire group were discussed by witnesses for both petitioners and respondent,[1] as were the conditions under which Haitians are confined.[2] There was, in fact, very scant testimony focused on the eight individual petitioners.[3] On all mat-

---

**1.** Petitioners' Exhibits 1, 2 and 3, introduced during the testimony of Miss Dianne Cullinane, compare graphically statistical evidence concerning the release and detention pending final adjudication of two groups, the 86 Haitians transferred to the SPC from Florida and the 183 other asylum applicants processed in the New York district in 1981. INS General Attorney Michael DiRaimondo spoke of the processing of all 86 Haitian detainee cases, Tr. at 174–7, and addressed the statistics prepared by petitioners. *Id.* at 238–9. Sava also accepted the statistics regarding parole rates for Haitians and non-Haitians, *see id.* at 420–1, and testified that the outcomes resulted from case-by-case review. *Id.* at 422.

**2.** The conditions at the SPC were discussed by Sister Mechtilde Benoit and Miss Joanne Whitaker. All Haitians confined in that facility suffer the same deprivations and receive equal treatment.

**3.** Detailed histories of exclusion proceedings were given by DiRaimondo with regard to the eight original petitioners in an attempt to explain the length of their incarceration. Tr. at 178–80, 183–9. Some of the chronicled events, such as the August 31 meeting about the status of the cases and the general problem of delay, related to all 86 Haitians. *Id.* at 180–3. Sava was speaking specifically of the eight when he noted that none had documents, all sought political asylum, none had family members able to confer derivative immigration benefits on them, none offered to post bond and decisions on their applications were expected "within a relatively short time." *Id.* at 405–6. It is clear that these descriptions would remain constant if Sava were asked to consider the group of 86 transferees. *See id.* at 457–9 (testifying that none of the 86 were businessmen or women, none posed a threat to security and none had a prior entry into the United States). The most

ters central to the findings of group-based decision making and discrimination, sufficient evidence is before the court with respect to all Haitians detained at the SPC.

Respondent argues that the proposed amendment is prejudicial to its right to a full hearing on the merits with respect to the class members. This proposition, though arguably relevant to the pending summary judgment motion, is inapposite to the issue at hand. Amendment itself does not assure the class members the relief won by petitioners, but merely the opportunity to seek certification and then summary disposition of the amended petition. The government's claim is misplaced, in any event, because it ignores the significant amount of evidence already produced on behalf of the purported class members.

■ Discretionary leave to amend is granted petitioners. Despite the advanced stage reached by the underlying action, respondent has failed to demonstrate that prejudice will result from amendment. Due to the identity of issues and circumstances among all Haitian detainees and the uniquely generalized tone of the prior proceedings, the interests of justice demand that petitioners be allowed to prosecute the action on behalf of similarly situated Haitian detainees.

To deny the motion would entail needless waste and a disregard of effective judicial administration. See Mullaney v. Anderson, 342 U.S. 415, 417, 72 S.Ct. 428, 429, 96 L.Ed. 458 (1952) (allowing the addition of new plaintiffs, under Rule 21, F.R.Civ.P., immediately before Supreme Court review); Hicks v. Crown Zellerbach Corporation, 49 F.R.D. 184, 196 7 (E.D.La.1967) (granting leave to amend a class action to expand the class immediately before trial). The amendment in this case can be analogized to the class enlargement permitted in Hicks because the specific issues of abusive and discriminatory adjudications already before

the court will remain constant while the group of persons affected by a ruling expands. See Hicks, supra at 197. Given the non-particularized nature of proof at the evidentiary hearing, it would be distinction without difference to emphasize the absence of an underlying class action.

The motion to amend is granted, alternatively, under Rule 15(b). As noted above, both respondent and petitioners introduced at trial evidence of the treatment of all 86 Haitians detained in Brooklyn. The purported class members all were among that group of 86. Sava's generalized descriptions of petitioners apply equally to all 86, and his comparative factor analysis relates to all aliens requesting parole. Except for the immigration applications and Sava's responses thereto, all the important testimony and exhibits concerned the entire proposed class. The lawsuit having been treated throughout its course as a class action, only the tyranny of formalism could support denial of the motion under Rule 15(b).

## THE MOTION TO CERTIFY THE CLASS

■ While the precise class action provisions of Rule 23, F.R.Civ.P., do not apply to habeas corpus proceedings, a federal court may permit multi-party habeas actions similar to the class actions authorized by the Rules of Civil Procedure when the nature of the claim so requires. *United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125 (2d Cir. 1974), *cert. denied*, 421 U.S. 921, 95 S.Ct. 1587, 43 L.Ed.2d 789 (1975). Considerations of judicial economy and fairness argue persuasively for the construction of a procedure analogous to the class action to be employed by incarcerated persons sharing certain complaints about the legality of their imprisonment. *Id.* at 1126; *Nguyen Da Yen v. Kissinger*, 528 F.2d 1194, 1202–4 (9th Cir. 1975); *Fernandez-Roque v. Smith*, 91 F.R.D. 117, 122 (N.D.Ga.1981). Such initiative and flexibility are essential to modern use of the writ in order to cut through

important testimony, Sava's discussion of his parole policy and his justification for releasing all non-Haitian applicants, is relevant to all detained Haitians. Petitioners' attempt to compare themselves to similar paroled aliens would

weigh against post-judgment amendment if the purported class members had not filed documents demonstrating their own individual characteristics.

barriers of form and insure that miscarriages of justice are corrected. *See Hensley v. Municipal Court, San Jose Milipitas Judicial District, Santa Clara County, California,* 411 U.S. 345, 349–50, 93 S.Ct. 1571, 1573–74, 36 L.Ed.2d 294 (1973); *Soroa-Gonzales v. Civiletti,* 515 F.Supp. 1049, 1056 (N.D.Ga. 1981).

■ The prerequisites of Rule 23—numerosity, common questions of law or fact, typicality, and fair and adequate protection of the class members' interests—are instructive in group habeas litigation. *See United States ex rel. Sero, supra* at 1126; *Fernandez-Roque, supra* at 122–3. The government objects to class-like treatment of these petitioners because of the size of the proposed class and the alleged absence of common issues of law or fact, but apparently concedes that petitioners meet the latter two criteria. The proposed class of 53[4] Haitians who were transferred by INS to the SPC and are still detained there satisfies the numerosity requirement of Rule 23(a). Smaller groups have achieved class status upon findings that joinder was impracticable. *See, e.g., United States ex rel. Walker v. Mancusi,* 338 F.Supp. 311, 315–16 (W.D.N.Y.1971), *aff'd,* 467 F.2d 51 (2d Cir. 1972) (38 prison inmates); *see generally United States ex rel. Sero, supra* at 1126–7 (discussing classes of 18 and 40 that met the requirement of numerosity).

■ Although more stringent standards of commonality may apply to group habeas actions, *United States ex rel. Sero, supra* at 1127, the proposed amended petition presents sufficiently uniform allegations on behalf of all detained Haitians. In highlighting the acknowledged differences in each Haitian's biographical data, respondent misinterprets the thrust of the proposed class action. The common thread binding these individuals is their claim that Sava abused his discretion and discriminated against them as blacks or Haitians by refusing to consider, or considering in an illegitimate manner, their parole requests. Their collective action seeks to remedy defendant's policies which operated as to each of them *"apart from and regardless of* the[ir] individual circumstances." *Hicks, supra* at 187 (emphasis in original). The "existence and operation of a pervasive policy affecting all" Haitians "is the question of law or fact common to all members of the class." *Id.* at 187–8; *see Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920, 937 (2d Cir. 1968); *Fernandez-Roque, supra* at 122; *Sobel v. Yeshiva University,* 477 F.Supp. 1161, 1171 (S.D.N.Y. 1979) (Goettel, J.). The instant case is distinguishable from *Nguyen Da Yen v. Kissinger,* 70 F.R.D. 656 (N.D.Cal.1976), because it involves a "broad attack" against a policy applying to all members, rather than individual complaints about separate and independent INS adjudications. *See id.* at 663. Here, "the problems in the different files," *id.* at 663–4, are identical—each allegedly reflects a callous and discriminatory practice of parole denial. These habeas petitioners merit class-like status. The class consists of all Haitian aliens transferred from INS's Krome facility to the SPC on July 18, 1981, who have requested political asylum and parole, but have remained in respondent's custody.

## THE MOTION FOR SUMMARY JUDGMENT

■ The government opposes petitioners' Rule 56, F.R.Civ.P., motion on two grounds. First, it invokes the same differences in factual circumstances among petitioners relied upon to contest class certification. Next, it contends that petitioners' motion is procedurally deficient for failure to comply with Rule 3(g) of the Local Rules of Procedure ("Civil Rules") of this court regarding submission of a statement of material facts as to which there is no dispute. This latter argument needs little discussion. Petitioners have, in fact, proffered a Rule 3(g)

---

4. Petitioners list 46 persons as entitled to class treatment. Apparently, one of these aliens did not arrive at the SPC with the group of 86 transferees from Florida, and is no longer detained in Brooklyn. DiRaimondo affidavit ¶ 3 & n.*. The original eight petitioners were not included in either party's tabulation, so the class totals 53 members.

statement[5] setting forth six material facts as to which no genuine issue exists.[6] Respondent, however, has not met its obligation to respond with a list of those facts as to which it contends that genuine issues do exist. Therefore, "[a]ll material facts set forth in the statement ... served by the moving party will be deemed to be admitted." Rule 3(g).

Respondent seeks trial on the merits regarding the administrative action on each class members' immigration application. The unique individual characteristics of each Haitian detained at the SPC, as well as the varying administrative postures of their asylum proceedings, purportedly require denial of the summary judgment motion. While this information may be relevant to the risk of absconding presently purportedly posed by these detainees, it says nothing about Sava's prior determination of their parole requests. The judgment of March 5, and the judgment now

sought by the new petitioners, stemmed from Sava's failure to consider Haitian parole applications on a nondiscriminatory, case-by-case basis. It would be absurd indeed to allow Sava to defeat summary judgment by relying on data he ignored or manipulated at the time it was most relevant.[7]

As to the most crucial findings in the March 5 opinion, the 45 new petitioners are indistinguishable from the original eight and are thus deserving of summary judgment. All 45 requested parole without success. A cursory review of the parole requests and Sava's corresponding denial letters reveals the same infirmities that infested his treatment of the eight. Some rejection letters were sent over four months after the initial parole request.[8] This unusually long delay rebuts Sava's claim that processing time and potential length of detention are important considerations in de-

---

**5.** It is assumed that respondent somehow overlooked the filing of petitioners' statement. Although that document is mislabeled as a 9(g) statement, in accord with past numbering of the rules, such an error cannot affect its validity and could not have motivated respondent's contention.

**6.** In essence, petitioners' statement classifies as undisputed the applicability of the class definition to all 53 members, the fact that all have received offers of sponsorship, and the fact that all were included in the statistical evidence presented to the court at the evidentiary hearing and all are similarly situated. As the instant opinion makes clear, the court reached each of these conclusions through an independent review of the record.

**7.** DiRaimondo submitted an affidavit designed to demonstrate that material differences exist among the 45 new petitioners. The distinctions were cited, however, in conclusory fashion suggesting that careful, individualized analysis of asylum claims has not been performed to date. For example, DiRaimondo stated that "a close scrutiny of the movants' files will likely result in the uncovering of inaccurate statements varying in degree from one detainee to another." DiRaimondo affidavit ¶ 6. If such "close scrutiny" was not performed at the time Sava denied the parole requests, as seems to be admitted, summary judgment is mandated. DiRaimondo suggests that the substantive merits of petitioners' asylum claims also vary *because some of the 45 provide the type of detailed story that Sava finds most persuasive. See id.*

at ¶ 8. Although the court will not consider Sava's revamped political asylum analysis nor the fruits of investigations conducted after parole denials, *see infra* at 13–14 & n. 9, this comment illustrates the insincerity of INS' claims. Summary judgment cannot be defeated by suggesting that some class members may be more worthy of parole than those who have already been victorious on the merits.

**8.** At trial, discussion of similar delays in processing the original petitioners' applications did not include any excuses for such tardiness. By affidavit, the government now offers an explanation. Without naming individual detainees, Sava and DiRaimondo claim that the files of those who did not receive a prompt response were misrouted by the INS clerical staff. Sava affidavit ¶ 5; DiRaimondo affidavit ¶ 5. It is difficult to credit such a generalized, self-serving and unverifiable explanation offered for the first time six weeks after trial. In any event, Sava does not explain why he considered State Department recommendations received in the interim in reaching his parole conclusions. Sava affidavit ¶ 15. State Department comments were not part of the factor analysis described to the court. Negative recommendations do not lead to revocation of previously granted parole, *see* Tr. at 449–50, because they are designed for the use of the immigration court, not the District Director, and "the mere fact of the unfavorable recommendation is not all conclusive." *Id.* at 451; Opinion at 23 & n.23.

termining whether to release an alien. *See* Prior Opinion ("Opinion") at 23. Several of the denials mentioned negative State Department asylum recommendations as partial justification for continued detention, indicating that Sava either wrongly delayed action in anticipation of such recommendations or judged Haitians by a factor not applied to any other prospective immigrant. *Id.* Finally, the bulk of the denials were exact replicas of the basic "insufficient information" letter sent to two of the original petitioners. *Id.* at 1–2.

■ Conspicuously absent from respondent's papers in opposition to summary judgment is the claim that individual characteristics played a role in Sava's parole denials for the 45 new petitioners. Granted, the government now accepts the court's conclusion that description by generality is inappropriate for the Haitians at the SPC, *see* DiRaimondo affidavit ¶¶ 5–8, there is no statement or argument, however, that their treatment was different from that of their eight countrymen, nor that the government possesses any evidence to that effect. The prior determination, see Opinion at 21–37, applies in all respects to the entire class now before the court. In sum, summary judgment is granted upon findings that Sava failed to exercise his statutory discretion with respect to petitioners or abused that authority by acting arbitrarily, in contradiction to established policy and with a desire to discriminate against Haitian aliens.

The individual characteristics noted by respondent in opposition to the motions for certification and summary judgment will be considered insofar as they suggest that release is inappropriate due to likelihood of absconding. The court now must consider whether the government has shown that such danger exists.

RELIEF

Respondent was given 10 days from March 5 to demonstrate that any or all of the eight original petitioners pose a risk of absconding if released. Affidavits have been submitted in an attempt to show that these Haitians cannot be expected to appear voluntarily at future immigration proceedings. Not being able to predict the outcome of the instant motions, the government did not produce similar affirmations concerning the 45 Haitians who have been added to the class. The discussion below will show that respondent will not be prejudiced by the court's consideration of all 53 Haitian detainees in structuring relief at the present time.

The government's evidence is best considered generally at first. Several broad categories of data purport to satisfy the burden placed on respondent by the court. First, the government offers evidence obtained by United States Embassy personnel in Haiti who recently were dispatched to gather information tending to corroborate or contradict statements made by petitioners in their asylum applications. The investigation was designed to show that aliens' statements are often self-serving and exaggerated, thus substantiating Sava's strong preference for documentation. Second, Sava presents an updated review of the 12 non-Haitians found most similar to petitioners, including their full immigration files and amended justifications for his parole decisions. Third, Sava attempts to clarify the factor analysis employed in making parole decisions in order to correct purported misinterpretations and misstatements by the court. Fourth, both Sava and DiRaimondo give detailed testimony about the administrative posture of petitioners' exclusion hearings.

■ Post-hoc rationalizations were not invited by the March 5 opinion. While it is legitimate for Sava to explain trial testimony that the court may have misconstrued, he may not re-open the record for factual material or administrative standards not disclosed or discussed at trial. The government is bound by the unambiguous descriptions of policy and analytical devices presented in live testimony subject to cross-examination. *See N.A.A.C.P. v. Alabama ex rel. Patterson*, 360 U.S. 240, 243, 79 S.Ct. 1001, 1003, 3 L.Ed.2d 1205 (1959) (respondent bound by its previously taken position regarding petitioner's compliance with a

court order). The court will not accept individual appraisals of petitioners based on information collected *after* Sava was found to have discriminated against them, especially when such data apparently is not sought with respect to any non-Haitian excludable alien. If respondent wished to contest the accuracy of petitioners' identifications or personal histories, it had the opportunity at trial. *See* Tr. at 184 (making same claim regarding petitioner Toussaint's identity as appears in paragraph 7A of the Sava affidavit). Nor will the court sanction a procedure in which a witness reviews certain documents, testifies as to his refreshed recollection of conduct taken with respect to those documents, is cross-examined thereon, and then *re-examines* the doc-

uments and offers expanded explanations via affidavit after judgment is entered.[9] Thus, the first two new categories of evidence will be excluded as beyond the scope of the record and inconsistent with the purposes of the March 5 order.

In his affidavit, Sava explains that documentation and "facial validity of the aliens' political asylum application" are the primary factors influencing parole determinations. Sava affidavit ¶¶ 3, 4. Of some relevance are release conditions, but offers of sponsorship or bond come into play "only after an alien has satisfied [Sava] that he is *prima facie* entitled to parole." *Id.* at ¶ 5. The initial determination is based on documentation,[10] seriousness of the asylum application[11] and family ties able to confer a

---

**9.** If respondent wished to contest the findings of fact incorporated into the March 5 opinion, the proper procedure would have been a motion pursuant to Rule 52(b), F.R.Civ.P., made within 10 days of the decision. Such motions are designed to correct findings of fact, but not "to serve as a vehicle for a rehearing." *Davis v. Mathews*, 450 F.Supp. 308, 318 (E.D.Cal. 1978); *Evans, Inc. v. Tiffany & Co.*, 416 F.Supp. 224, 244 (N.D.Ill.1976) (Rule 52(b) motions "are not intended merely to relitigate old matters nor are ... [they] intended to allow the parties to present the case under new theories. Instead, these motions are intended to correct manifest errors of law or fact or to present newly discovered evidence."). Respondent's failure to proceed in that fashion binds him to the court's findings and negates his attempt to circumvent the required motion practice by presenting new evidence and reinterpretations of old evidence in post-hearing affidavits. Furthermore, had a Rule 52(b) motion been made, it would have been denied as an attempt to secure a rehearing on the merits rather than to amplify the findings of fact. *See Heikkila v. Barber*, 164 F.Supp. 587, 592 (N.D. Cal.1958); *Fajardo Sugar Growers Association v. United States*, 161 F.Supp. 912, 916 (S.D.N. Y.1958) (Murphy, J.), *aff'd*, 264 F.2d 671 (2d Cir. 1959) (plaintiff barred from urging, on a Rule 52(b) motion, grounds for relief not presented before judgment). The "new" evidence proffered would have been rejected because it was obtainable before trial if deemed relevant by respondent.

**10.** The documentation concept is discussed in a new perspective. Rather than a rigid documented/undocumented dichotomy, Sava asserts "an obvious gradation in documentation." Sava affidavit ¶ 2. Various papers instill in Sava different levels of confidence that a particular alien has been positively, accurately

identified before being considered for parole. *Id.* There exists, according to this novel view, a spectrum with four shades—no documents or falsified records signal the possibility that identification statements may be exaggerated; passports without visas solidly establish one's identity, nationality, age, occupation, family composition and previous travel experience; passports with visas from other nations which screen visa applicants constitute "the substantial equivalent" of full documentation; and, passports with United States visas indicate satisfaction of a full consular screening process abroad. *Id.* While this framework of documentation is plausible on its face, it contradicts the equally plausible scheme presented at the evidentiary hearing and upon which the March 5 opinion was based. An example of Sava's striking departure from previously articulated standards is his description of aliens with a passport and no visa. Such aliens have been shifted from the undocumented category, *see* Opinion at 12, to the documented. Revision of unambiguous trial testimony will not be condoned.

**11.** Sava disputes the court's interpretation of the extent of his inquiry into the seriousness of political asylum applications. He challenges the court's conclusions about both the scope of his review of such applications and the results of his analysis of petitioners' documents. Sava affidavit ¶ 4 & n.*. The asylum request must be "serious," but this does not mean "non-frivolous." *Id.* Rather, seriousness is tested through examination of several factors including whether an applicant "served in his origin country's government or army previous to a change in regimes," whether the alien or his relatives have been abused because of their religion, race or political activity, and whether

benefit upon the alien. *Id.* Sava proceeds to argue that none of the petitioners were entitled to parole under these refined standards.

It is not respondent's prerogative to alter the rules after the game has been played. *See* n. 9 *supra.* The factor analysis outlined in Sava's affidavit is materially different from that described at trial. Not only has he reformulated the definitions of crucial terms, *see* nn. 10, 11 *supra,* he has manipulated the entire framework of the parole inquiry.

At no time during his testimony did Sava so much as infer that sponsorship is not considered "until [he is] satisfied that the alien does not *prima facie* pose a significant risk of absconding." Sava affidavit ¶ 5. Release conditions were discussed as a vital part of the factor analysis insofar as they created expectations concerning an alien's degree of future cooperation with INS.[12] Thus, Sava's *prima facie* standard is unacceptable as inconsistent with the record established at trial.

Sava also seeks to blur the distinction between factors relevant to the absconding inquiry and compelling factors mandating

release regardless of the risk. Family ties that can ultimately confer benefits on aliens were acknowledged as humanitarian factors for release. *See* Opinion at n. 6. By attempting to merge that compelling factor into the risk of absconding calculus, *see* Sava affidavit ¶ 5, Sava now distorts his prior testimony and diverts attention from general family characteristics, such as ability to sponsor or provide basic necessities, which were relevant in his earlier parole guidelines. Opinion at 6. The government will be held to the original formulation of Sava's parole policy.

Apparently, 39 of the 53 class members have had their asylum claims denied by immigration judges and have initiated the appeals process available to them. Respondent asserts that "an alien whose exclusion proceeding has resulted in a negative determination poses an extremely high absconding risk, materially greater than one whose proceeding has not yet been adjudicated." Sava affidavit ¶ 7A at 7. While this argument possesses some common-sense appeal, it fails, like those discussed above, to respond within the confines of the March 5 order.

there is a specific foreign policy concerning the regime in power in the alien's country of origin. *Id.* Sava's ultimate goal is to determine whether the asylum application has "any realistic chance of approval by the appropriate decision makers." *Id.* Predicting whether an application would get favorably recommended was an objective mentioned by Sava during trial, *see* Tr. at 414, but it had significantly different consequences, and was far less expansive, at that time. Instead of investigating military or governmental service and the particulars of the claimed repression, Sava was "really assessing whether [the application was] frivolous or serious." *Id.* at 415. Sava's trial testimony, taken as a whole, suggests that the standards set forth in his affidavit are of recent creation and are absolutely inconsistent with those elicited in questioning by the court. When asked by the court whether predicting the success of an asylum application meant that he took into account in making parole decisions the "likelihood of [the government] acting favorably on the application," Sava replied, "[n]ot necessarily acting favorably.... I try to put myself there [and] say, 'Well is this frivolous, really?' " *Id.* at 414. Sava's later reassertion that he weighed frivolity versus seriousness came immediately after the court paraphrased his testi-

mony and concluded that he looked not to "what the government might or might not do" but to the applicant's state of mind. *Id.* at 415. His comments must be taken as an approval of that interpretation. When he admitted that petitioners' applications were not skeletal, *id.* at 440, Sava, in effect, conceded that they had met his test and that nothing in the form of the applications led to his denials of parole. While the court will not approve of Sava's gross distortion of prior testimony, it is troubled by the fact that at least several of petitioners' asylum applications seem to satisfy even the stricter standards now enunciated, *see* DiRaimondo affidavit ¶ 8, yet, none were paroled.

12. Offers of bond and/or sponsorship were listed among the several factors considered by Sava in deciding whether to grant or deny parole, Tr. at 403-4, but at no time was the release condition factor isolated for special treatment or relegated to secondary status. Moreover, the leverage acquired by INS through bond or approved sponsorship was presented as an important factor in making the essential judgment as to whether the alien is likely to appear for future proceedings. *Id.* at 407-8.

██ It would be ludicrous to ignore Sava's abusive and discriminatory parole determinations, and petitioners' 10-month confinement in the SPC, on the ground that subsequent events might tend to support the correctness of his decisions. Recent administrative decisions cannot cure Sava's failure to exercise properly his discretion, nor can they cleanse the unlawfully tainted detention of these petitioners. Petitioners are confined because Sava refused to exercise his release authority in their behalf, not because of any action or inaction by immigration judges. Habeas exists to aid the illegally imprisoned. Since the exclusion hearings are not the justification for petitioners' confinement, they are irrelevant to this habeas action. This is not a situation in which events following an unlawful detention provide a legitimate, independent basis for incarceration. *See Roberts v. Commonwealth of Virginia*, 317 F.Supp. 1311, 1312 (W.D.Va.1970) (legality of pretrial detention mooted by subsequent conviction and sentence). The parole authority is not affected by negative findings in the immigration courts. *See* 8 C.F.R. § 212.5 (district director may grant parole "after a finding of inadmissibility has been made").

██ Reference to analogous situations bolsters petitioners' claim that adverse rulings by immigration judges cannot remedy baseless parole denials. In *Kordopatis v. Hurney*, 254 F.Supp. 70 (N.D.Ill.1966), an INS District Director's decision to deny bail to a detained alien found deportable was reviewed pursuant to a petition for habeas corpus. The court announced its power to "admit the petitioner to bail pending appeal on the deportation order" if the District Director acted without a reasonable foundation. *Id.* at 71. In the context of criminal convictions, denial of bail pending appeal has been reviewed for arbitrariness. *Finetti v. Harris*, 460 F.Supp. 1069, 1073 (S.D.N.Y.1978) (Stewart, J.), *aff'd in part rev'd in part*, 609 F.2d 594 (1979). Although different standards of review and different deci-

sion making criteria distinguish the criminal and deportation cases from the instant litigation, those cases rebut respondent's implicit argument that habeas relief is unavailable to those whose "guilt" has been established at the first level of review.

██ Completion of petitioners' exclusion hearings cannot foreclose parole for a more fundamental reason. There comes a point at which "temporary" detention takes on the aura of permanence. When indefinite confinement appears in the immigration context it corrodes the spirit of compassion and humanity which our laws are meant to reflect. *See Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958); Opinion at n.29. In pursuit of such lofty goals, courts have ruled that habeas relief is available to excluded aliens if the government cannot arrange for their expulsion within a reasonable time. *See Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1389 90 (10th Cir. 1981); *Soroa-Gonzales v. Civiletti*, 515 F.Supp. 1049, 1061 (N.D.Ga.1981). Petitioners' plight is somewhat less severe than that of the aliens awaiting exclusion because, if their appeals are unsuccessful, they do not face indefinite post-exclusion incarceration. Yet, their suffering cannot be denigrated and their prospects for additional grief cannot be minimized. After 10 months of arbitrary imprisonment in an inadequate facility, the Haitians persistent enough to press their claims for political sanctuary face up to 10 more months of the same. *See* Tr. at 453 (appeals process could occupy from 2 to 10 months before the Board of Immigration Appeals reaches a decision, and, implicitly, more time for Sava to carry out his mandate). Such maltreatment of aliens "seeking freedom and justice" on our shores is offensive to the principles underlying our immigration statutes and regulations and our treaty commitments. *See Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442, 532 (S.D.Fla.1980).[13]

---

**13.** The length of petitioners' incarceration is relevant for another reason. One rationale offered for Sava's refusal to parole any Haitian was his expectation that final decisions as to

their admissibility would come "within a fairly short period of time." Tr. at 405–6. INS's inability to process Afghan asylum claims within a year was the primary reason for Sava

The government has failed to rationalize Sava's actions with respect to the Haitians detained at the SPC. Its submission of voluminous new information and intricate revised analyses cannot obscure the unlawfulness of Sava's parole determinations. No attempt has been made to prove that the District Director actually considered petitioners as individuals deserving the same attention as accorded all other excludable aliens. Instead, respondent opposes their release by offering evidence collected through unique procedures not applied to any other group and not even applied to petitioners at the time their parole requests were processed. In addition, the government wants to amend the descriptions of non-Haitian parolees given by Sava at trial as the foundation of his prior conduct. Application of the already accepted factor analysis still demands granting the petition for habeas corpus.

A federal court may order the release or bail of a petitioner whose detention is illegal. *See Baker v. Sard*, 420 F.2d 1342, 1343 (D.C.Cir.1969); *Postelwait v. Markley*, 342 F.2d 677, 678 (7th Cir. 1965) (*citing McNally v. Hill*, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1934)). The conditions of release may be set by the court or may be remanded to the party responsible for the unlawful confinement. *See Powers v. Schwartz*, 448 F.Supp. 54, 57–8 (S.D.Fla. 1978), *vacated and remanded as moot*, 587 F.2d 783 (5th Cir. 1979); *United States ex rel. Merritt v. Vukcevich*, 339 F.Supp. 779, 782 (D.N.J.1972).

The court's reluctance to interfere inordinately with executive control of immigration policies persuades it to follow the latter course. District Director Sava is ordered, therefore, to parole all 53 members of the class within seven days of the date of this opinion under reasonable release conditions.[14] Any member of the class who has exhausted all available appellate processes and is ready to be excluded on the date of this decision shall be exempted from this order unless he or she cannot physically be returned to Haiti within 20 days of this order. After 10 months of unlawful confinement in a harsh environment, justice demands swift remedial action.

IT IS SO ORDERED, and judgment is to be entered by the Clerk of the Court immediately on the filing of this opinion.

---

granting them compelling status as a group. *Id.* at 385–7. The certainty of such lengthy detention led Sava to repress his normal concern about whether Afghans would appear at future exclusion hearings, *id.* at 508–11, to such an extent that bond alone seemed to guaranty their release. *Id.* at 510–11. Facing up to 20 or more months of incarceration, petitioners warrant at least as much leniency as the Afghans whose situations appeared so compelling in advance of detention that they escaped it altogether.

**14.** Reasonable release conditions may include any device designed to maximize the likelihood that the alien will not abscond, except insofar as that device forecloses release. Thus, bond may be required if tailored to individual risk and if not excessive in light of past practices. Furthermore, the government may seek family sponsors for the 11 or so class members with identifiable relations in the United States. Individual sponsors arranged by organizations may be screened in a reasonable fashion, including a requirement that they live within the New York area. Finally, INS may construct non-oppressive procedures for maintaining contact with the paroled Haitians.

Robert Abrams, Atty. Gen. of New York, Albany, N. Y., for Thomas A. Coughlin, III, Commissioner of New York State Dept. of Correctional Services; David B. Roberts, Albany, N. Y., of counsel.