**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KEVIN MARILLEY; SALVATORE PAPETTI; SAVIOR PAPETTI, individually and on behalf of all others similarly situated,<br>*Plaintiffs-Appellees*,<br><br>v.<br><br>CHARLTON H. BONHAM, in his official capacity as Director of the California Department of Fish and Game,<br>*Defendant-Appellant*. | No. 13-17358<br><br>D.C. No.<br>4:11-cv-02418-DMR<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Donna M. Ryu, Magistrate Judge, Presiding

Argued and Submitted
July 7, 2015—San Francisco, California

Filed September 18, 2015

Before: Susan P. Graber and Paul J. Watford, Circuit
Judges, and Paul L. Friedman, District Judge.[*]

---

[*] The Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting by designation.

Opinion by Judge Friedman;
Dissent by Judge Graber

**SUMMARY**[**]

**Constitutional Law**

The panel affirmed the district court's summary judgment in favor of a plaintiff class of non-resident commercial fishers who contended that California's discriminatory fishing fees violated the Privileges and Immunities Clause of the United States Constitution.

The panel held that California's differential commercial fishing license fees, Cal. Fish & Game Code §§ 7852, 7881, 8550.5, and 8280.6, which charged non-residents two or three times more in fees than residents, violated the Privileges and Immunities Clause because California failed to offer a closely related justification for its discrimination against non-residents.

Judge Graber dissented because she would hold that further evidentiary development is necessary to determine whether the differential fees are permissible under the Privileges and Immunities Clause, and she would reverse the summary judgment and remand for further proceedings.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Kamala D. Harris, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Annadel A. Almendras, Supervising Deputy Attorney General, Gary Alexander and M. Elaine Meckenstock (argued), Deputy Attorneys General, Office of the Attorney General, Oakland, California, for Defendant-Appellant.

Stuart G. Gross (argued) and Jared M. Galanis, Gross Law, P.C., San Francisco, California; Todd R. Gregorian and Tyler A. Baker, Fenwick & West LLP, Mountain View, California, for Plaintiffs-Appellees.

**OPINION**

FRIEDMAN, District Judge:

Commercial fishers in California are subject to a bevy of fees. For certain fees, however, non-residents are charged two to three times more than residents. Plaintiffs represent a class of non-resident commercial fishers who contend that California's discriminatory fees violate the Privileges and Immunities Clause of the United States Constitution. Because California has failed to offer a closely related justification for its discrimination against non-residents, we agree with plaintiffs and therefore affirm the district court's grant of summary judgment to the plaintiff class.

**BACKGROUND**

The named plaintiffs are commercial fishers residing outside California. They represent a class of non-residents

who, since 2009, have purchased commercial fishing licenses, registrations, or permits from California and paid higher fees than residents. Plaintiffs sued Charlton Bonham, in his official capacity as the Director of the California Department of Fish and Game, alleging that the differential fees violate the Privileges and Immunities and Equal Protection Clauses of the United States Constitution.

Plaintiffs challenge four specific fees: general commercial fishing license fees, commercial fishing vessel registration fees, Herring Gill net permit fees, and Dungeness Crab vessel permit fees. *See* Cal. Fish & Game Code §§ 7852, 7881, 8550.5, 8280.6. While the parties dispute the prevalence of Herring Gill and Dungeness Crab permits, it is undisputed that, at a minimum, non-resident commercial fishers must purchase the general license to fish in California waters and a vessel registration to do so from a boat they own or operate. *See id.* §§ 7852, 7881. In 2012–13, the relevant fees were as follows:

- Commercial fishing license: $130.03 for residents; $385.75 for non-residents;

- Commercial fishing vessel registration: $338.75 for residents; $1,002.25 for non-residents;

- Herring Gill net permit: $359.00 for residents; $1,334.25 for non-residents;

- Dungeness Crab vessel permit: $273.00 for residents; $538.00 for non-residents.

All four licenses would set a resident back $1,100.78, but a non-resident $3,260.25.

Following discovery, the parties filed cross-motions for summary judgment. The district court concluded that California had failed to demonstrate a genuine issue of material fact and granted summary judgment to the plaintiff class on its Privileges and Immunities Clause claim. The district court then entered final judgment as to plaintiffs' Privileges and Immunities Clause claim pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.[1]

## STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We review a grant of summary judgment de novo. *See Pac. Shore Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1156 (9th Cir. 2013). Viewing the evidence in the light most favorable to the State, we must decide whether there are any genuine disputes of material fact and whether the district court correctly applied the substantive law. *See Olsen v. Idaho St. Bd. Of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## DISCUSSION

The Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Consti. art. IV, § 2, cl. 1. This clause "was designed 'to place the citizens of each State upon the same footing with citizens of

---

[1] The district court expressly did not reach or enter final judgment on plaintiffs' Equal Protection Clause claim. We therefore lack jurisdiction over that claim. *See* 28 U.S.C. § 1291.

other States, so far as the advantages resulting from citizenship in those States are concerned.'" *Sup. Ct. of Va. v. Friedman*, 487 U.S. 59, 64 (1988) (quoting *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180 (1869)); *see also Toomer v. Witsell*, 334 U.S. 385, 395 (1948) (The Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy."). The Clause thus "establishes a norm of comity" between residents and non-residents of a State, *Austin v. New Hampshire*, 420 U.S. 656, 660 (1975), to create "a national economic union," *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 934 (9th Cir. 2008) (quoting *Sup. Ct. of N.H. v. Piper*, 470 U.S. 274, 280 (1985)).[2]

The Clause, however, "is not an absolute." *Molasky-Arman*, 522 F.3d at 934 (quoting *Toomer*, 334 U.S. at 396). "While it bars 'discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States . . . it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it." *Id.* (quoting *Toomer*, 334 U.S. at 396). We therefore employ a two-part test to determine whether disparate treatment violates the Clause. "First, the activity in question must be 'sufficiently basic to the livelihood of the Nation' . . . as to fall within the purview of the Privileges and Immunities Clause." *Friedman*, 487 U.S. at 64 (quoting *United Bldg. & Constr. Trades Council v. Mayor and Council of Camden*, 465 U.S. 208, 221–22 (1984)). "Second, if the challenged restriction deprives nonresidents of a protected privilege, we

---

[2] "While the Privileges and Immunities Clause cites the term 'Citizens,' for analytic purposes citizenship and residency are essentially interchangeable." *Friedman*, 487 U.S. at 64.

will invalidate it only if we conclude that the restriction is not closely related to the advancement of a substantial state interest." *Id.* at 65 (citing *Piper*, 470 U.S. at 284). California contends that the differential license fees pass muster under both parts of this test. We disagree.

**A**

California does not dispute that plaintiffs' right to pursue "a common calling is one of the most fundamental of those privileges protected by the Clause." *Camden*, 465 U.S. at 219; *see also Toomer*, 334 U.S. at 403 ("Thus we hold that commercial shrimping in the marginal sea, like other common callings, is within the purview of the privileges and immunities clause."). It instead argues that, in addition to demonstrating that the affected activity is protected, plaintiffs must make two additional showings.

First, California argues that our decision in *International Organization of Masters, Mates, & Pilots v. Andrews*, 831 F.2d 843 (9th Cir. 1987), requires plaintiffs to show that the differential fees exclude them, in whole or in part, from commercial fishing. This showing cannot be made, California claims, because the percentage of non-resident commercial fishers in California has increased, not decreased. In *Andrews*, we held that the Clause was not violated by a statute regarding cost of living wage adjustments because the statute was "designed to provide equity between the wages of [citizen] and non-[citizen] workers." *Andrews*, 831 F.3d at 846. The statute in *Andrews* thus created equality, not inequality, and therefore did not run afoul of the Privileges and Immunities Clause because, we said, "the appellants ha[d] not shown that they are prevented or discouraged by the State from pursuing employment." *Id.*

California contends that our choice of the words "prevented or discouraged" upset decades of precedent and added an exclusion requirement to the first part of the test. We disagree. As we recited in *Andrews* just two paragraphs before, the first step requires only that "we determine first whether [the statute] burdens" rights protected under the Clause. *Id.* at 845. An exclusion requirement would undermine the purpose of the Clause because permitting a State to freely discriminate against non-residents up to the point they are driven out would not "place the citizens of each State upon the same footing with citizens of other States." *Lunding v. N.Y. Tax Appeals Tribunal*, 522 U.S. 287, 296 (1998) (quoting *Paul*, 75 U.S. (8 Wall.) at 180). And, to any extent that *Andrews* may have implied that a plaintiff must demonstrate exclusion from pursuing their common calling, the Supreme Court's subsequent statement in *Friedman* makes clear that "[n]othing in [its] precedents . . . supports the contention that the Privileges and Immunities Clause does not reach a State's discrimination against nonresidents when such discrimination does not result in their total exclusion from the State." 487 U.S. at 66.[3]

Second, California argues that *McBurney v. Young*, 133 S. Ct. 1709 (2013), the Supreme Court's most recent Privileges and Immunities Clause decision, requires that plaintiffs show that the differential fees were enacted for a "protectionist purpose." The Supreme Court in *McBurney* did note that prior cases "struck laws down as violating the

---

[3] Our conclusion is supported by the fact that, as the district court noted, our "most recent Privileges and Immunities Clause decision, *Molasky-Arman*, contains no discussion at all — at either step of the inquiry — of the extent to which the challenged law's increased burden on nonresidents led to any deterrence or exclusion."

privilege of pursuing a common calling only when those laws were enacted for the protectionist purpose of burdening out-of-state citizens." *Id.* at 1715. California urges us to read that statement to mean that proof of a protectionist purpose always is required to meet step one of our privileges and immunities inquiry. We cannot accept that interpretation of *McBurney*.

When the Court determines that the Privileges and Immunities Clause does not apply at all, it says so. For example, in *Baldwin v. Fish & Game Commission*, 436 U.S. 371, 388 (1978), the Court held that, because elk hunting was "not basic to the maintenance or well-being of the Union," the state's decision to charge non-residents more than residents for elk-hunting licenses "simply [did] not fall within the purview of the Privileges and Immunities Clause." In *McBurney*, the Court rejected one of McBurney's arguments — that Virginia's law denied them "the right to access public information on equal terms with citizens" of Virginia — for similar reasons, holding that the Privileges and Immunities Clause did not "cover[] this broad right." 133 S. Ct. at 1718.

By contrast, with respect to McBurney's common calling argument, the Court held that the Virginia law at issue did not "abridge [non-residents'] ability to engage in a common calling *in the sense prohibited by the Privileges and Immunities Clause*." *Id.* at 1715 (emphasis added). The Court reached that conclusion because the statute had only an "incidental effect" on the pursuit of a common calling, and because the distinction it made between citizens and non-citizens had a "distinctly nonprotectionist aim." *Id.* at 1716. This reasoning, along with the Court's discussion of earlier cases involving statutes with protectionist purposes, is a part of step *two* of the inquiry, which requires the state to

point to a "substantial reason[]" for the discrimination. *Friedman*, 487 U.S. at 67. "Part and parcel to this analysis is determining whether [the state has] demonstrated a substantial factor unrelated to economic protectionism to justify the discrimination." *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 97 (2d Cir. 2003).

Requiring proof of a legislature's protectionist purpose at the *first* step of the inquiry, as California urges, would negate the *second* step's burden on the state to provide a valid justification for the discrimination against non-residents. Moreover, an intent requirement would undermine the Clause's purpose to "plac[e] the citizens of each State upon the same footing with citizens of other States," *Lunding*, 522 U.S. at 296 (quoting *Paul*, 75 U.S. (8 Wall.) at 180), by mandating different outcomes depending upon a State's motive. We therefore reject California's invitation to read *McBurney* as a dramatic overhaul of the first step of the settled two-step inquiry.

To reiterate, contrary to California's arguments, the first step of the Privileges and Immunities Clause inquiry asks only whether the challenged statute directly burdens a protected activity. It is undisputed that California's commercial fishing license fees are significantly higher for non-resident fishers than for residents. And it is common sense that commercial fishing license fees directly affect commercial fishing. Those facts alone satisfy plaintiffs' burden at the first step of the inquiry. *See Toomer*, 334 U.S. at 396 (a statute that charged $25 to residents for commercial shrimping licenses, but charged $2,500 to non-residents "plainly and frankly discriminate[d] against non-residents" and thus satisfied the first step); *Mullaney v. Anderson*, 342 U.S. 415, 417–18 (1952) (holding that the Privileges and

Immunities Clause "would bar any State from imposing" a $5 license fee on resident fishers and a $50 fee on non-residents unless a State offered a substantial, closely related justification at the second step of the inquiry).

**B**

At the second step, the burden shifts to the State to demonstrate that "substantial reasons exist for the discrimination and [that] the degree of discrimination bears a close relation to such reasons." *Friedman*, 487 U.S. at 67.[4] To determine whether the State's proffered justifications bear a close relation to the discrimination, we must "consider[] whether, within the full panoply of legislative choices otherwise available to the State, there exist alternative means of furthering the State's purpose without implicating constitutional concerns." *Id.*

The Supreme Court has noted that "[t]he State is not without power . . . to charge non-residents a differential which would merely compensate the State . . . for any conservation expenditures from taxes which only residents pay." *Toomer*, 334 U.S. at 398–99. California argues that it is doing just that — merely compensating itself for

---

[4] California argues that the district court applied a purportedly different rule taken from the Supreme Court's "tax" cases, as opposed to its "common calling" cases, and failed to consider California's justifications for the discrimination. The Supreme Court, however, has employed the same two-step inquiry for both "tax" and "common calling" cases. *Compare Friedman*, 487 U.S. at 64–65 (challenge to a residency requirement for admission to the State bar), *with Lunding*, 522 U.S. at 296–98 (challenge to a differential income tax deduction). The district court applied the correct test and properly considered California's asserted State objectives.

expenditures on conservation and enforcement efforts from which non-residents benefit. But California claims that *Toomer* allows for inequality at step two and therefore *any* fee differential is permissible so long as the State does not "overcompensate" itself *in the aggregate*, which, according to California, means only that the amount collected from non-residents cannot exceed their collective "fair share" of the State's expenditures. These differential fees thus are permissible, according to California, because the total additional amount collected from non-residents (approximately $400,000) constitutes a mere 3% of the budget shortfall between costs and revenues (approximately $14.6 million) but non-residents comprise approximately 11% of the commercial fishers in California.

We are unpersuaded. Although we agree that obtaining compensation for expenditures the State makes for conservation or enforcement is a permissible state objective, the additional fees charged to non-residents must bear a close relation to the "taxes which only residents pay." *Toomer*, 334 U.S. at 399; *see also Molasky-Arman*, 522 F.3d at 934 (noting that "a 'substantial reason' for discrimination does not exist 'unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed'") (quoting *Toomer*, 334 U.S. at 398). In other words, a State may justify a differential fee by showing either that it is closely related to the costs of addressing a burden non-residents uniquely impose or that it approximates the amount in "taxes which only residents pay" towards the relevant State expenditures from which non-residents also benefit. *Toomer*, 334 U.S. at 399; *see also Tangier Sound Waterman's Ass'n v. Pruitt*, 4 F.3d 264, 267 (4th Cir. 1993) (*Toomer* permits state to discriminate against non-residents where state "establishes an 'advancement of a substantial

state interest' as a reason for the disparate treatment, and, in the facts of this case, evenly or approximately evenly distributes the costs imposed on residents and nonresidents to support those programs benefiting both groups."). Such a differential would "bear[] a close relation to the achievement of [a] substantial state objective[]," *Friedman*, 487 U.S. at 70, because it would address the particular evil non-residents present, unfairly benefiting from residents' tax expenditures. It also would place non-residents "upon the same footing with," *id*. at 64, or at least in "substantial equality" with California residents, *Toomer*, 334 U.S. at 396, by forcing an individual non-resident who benefits from the State's expenditures to contribute an amount substantially equal to that which an individual resident contributes across all fees and related taxes.

California does not claim, however — nor has it presented any evidence that shows — that the fee differential approximates the amount in taxes a resident contributes to the State's expenditures related to commercial fishing. *Mullaney*, 342 U.S. at 418; *see also Hicklin v. Orbeck*, 437 U.S. 518, 527 (1978) ("[T]he discrimination the [statute] works against nonresidents does not bear a substantial relationship to the particular 'evil' they are said to present."). California alone bore the step two "burden of showing that the discrimination is warranted by a substantial state objective and closely drawn to its achievement." *Friedman*, 487 U.S. at 68. It failed to carry that burden, despite ample opportunity to develop and support its offered justification and "all the facts . . . in [its] possession." *Mullaney*, 342 U.S. at 418–19.

## CONCLUSION

For the above reasons, we hold that California's differential commercial fishing license fees, Cal. Fish & Game Code §§ 7852, 7881, 8550.5, and 8280.6, violate the Privileges and Immunities Clause. Charging non-residents two to three times the amount charged to residents plainly burdens non-residents' right to pursue a common calling, in this case commercial fishing. Such discrimination violates the Privileges and Immunities Clause unless the State carries its burden to show "that such discrimination bears a close relation to the achievement of substantial state objectives." *Friedman*, 487 U.S. at 70. Although its stated objective, compensation for State expenditures for conservation or enforcement, is valid, California has failed to show that the differential fee charged to a non-resident is closely related to a resident's share of the State's expenditures.

**AFFIRMED.**

---

GRABER, Circuit Judge, dissenting:

I respectfully dissent. Although I agree fully with the majority's analysis at step one of the inquiry, I would hold, at step two, that the differential fees survive summary judgment. Further evidentiary development is necessary to determine whether the nonresident fees "merely compensate the State for any added enforcement burden [nonresidents] may impose or for any conservation expenditures from taxes which only residents pay." *Toomer v. Witsell*, 334 U.S. 385, 399 (1948).

We have little guidance to assist us in determining what the United States Supreme Court meant in the foregoing passage from *Toomer*. Only twice since *Toomer* has the Court quoted the phrase "taxes which only residents pay" in a privileges and immunities context, and in neither case did it explain the meaning of those words. *Baldwin v. Fish & Game Comm'n* , 436 U.S. 371, 401 (1978); *Mullaney v. Anderson*, 342 U.S. 415, 417 (1952). As I explain in more detail below, two state supreme courts have reached different conclusions about the proper interpretation of that phrase. But we do not know which (if either) of those courts got it right, because the Supreme Court denied certiorari in *both* cases. *Carlson v. Alaska Commercial Fisheries Entry Comm'n*, 519 U.S. 1101 (1997); *Glaser v. Salorio*, 449 U.S. 874 (1980). Further complicating our interpretive task, the Privileges and Immunities Clause of Article IV "is not one the contours of which have been precisely shaped by the process and wear of constant litigation and judicial interpretation over the years since 1789." *Baldwin*, 436 U.S. at 379.

Acknowledging those limitations, we must decide how to interpret the phrase "taxes which only residents pay." *Toomer*, 334 U.S. at 399. On the one hand, as the State urges, the phrase could be read to refer to residents' aggregate tax contribution to commercial fishing. Under that reading, California permissibly could charge differential fees to nonresidents so long as those fees do not exceed the nonresidents' fair share of the portion of commercial fisheries management costs that California residents' tax dollars fund.

The New Jersey Supreme Court has interpreted *Toomer* in this way. In *Salorio v. Glaser*, 414 A.2d 943 (N.J. 1980), the plaintiffs challenged New Jersey's imposition of an

Emergency Transportation Tax, which applied only to nonresident users of the state highway system. Although it found the record insufficiently developed to render a final decision, the New Jersey Supreme Court held that a tax that applied only to nonresidents could, in theory, pass constitutional muster, because "[t]he Constitution does not entitle nonresident commuters to a 'free ride.' The State may exact from them a fair share of the cost of adequate transportation facilities without violating the Privileges and Immunities Clause." *Id.* at 954. The court read *Toomer* and other Supreme Court cases to authorize a state to "impose upon non-residents the additional expenses occasioned by their activities within the state, or the reasonable costs of benefits which they receive from the state." *Id.* at 953.

Applying the *Salorio* court's reasoning here, nonresidents are on "equal footing" with residents so long as they are not charged more than their "fair share" of commercial fisheries management expenses that residents' tax dollars fund. California introduced evidence that nonresidents purchased 11% of commercial fishing licenses, while the differential fees for out-of-state licenses equaled only 3% of the net general fund contributions to the Department of Fish and Wildlife ("DFW") budget. The State asserts that it constitutionally could charge differential fees that total up to 11% of the DFW's general fund-supported commercial fishing expenditures, so the smaller fee that California actually charges is—*a fortiori*— permissible.

On the other hand, Plaintiffs read "taxes which only residents pay," *Toomer*, 334 U.S. at 399, very differently. They contend that the phrase requires a per capita calculation of a California resident's tax burden related to DFW's commercial fishing budget. The Alaska Supreme Court

adopted this alternative interpretation in *Carlson v. State*, 798 P.2d 1269 (Alaska 1990). There, the plaintiffs challenged Alaska's commercial fishing fees, which were three times higher for nonresidents than for residents. The state urged the court to follow *Salorio*. But the Alaska Supreme Court rejected the New Jersey Supreme Court's interpretation of *Toomer*:

> Implicit in *Salorio* is the notion that it is permissible to require nonresidents to pay up to 100% of their *pro rata* share of expenditures regardless of what percentage of their *pro rata* share residents are in fact paying. In other words, *Salorio*, as applied to this case, seems to add up to a general proposition that the state may subsidize its own residents in the pursuit of their business activities and not similarly situated nonresidents, even though this results in substantial inequality of treatment.

*Carlson*, 798 P.2d at 1278. The court held that the proper inquiry was "whether all fees and taxes which must be paid to the state by a nonresident to enjoy the state-provided benefit are substantially equal to those which must be paid by similarly situated residents when the residents' *pro rata* shares of state revenues to which nonresidents make no contributions are taken into account." *Id.*

Under the *Carlson* court's approach, the state would have to divide general fund expenditures for commercial fishing management by the total number of California taxpayers; the quotient would represent the maximum permissible differential fee. The State introduced evidence that net

annual general fund outlays for commercial fisheries
management total at least $12 million. Thus, for instance, if
there were 12 million taxpayers in California, the per capita
formula would limit the permissible differential fee to $1 per
nonresident fisher.[1]  According to Plaintiffs, this formula puts
residents and nonresidents on "equal footing" because their
out-of-pocket costs to support commercial fisheries are the
same.

I would reject the per capita formula.  The purpose of the
Privileges and Immunities Clause is to "place the citizens of
each State upon the same footing with citizens of other States,
so far as the advantages resulting from citizenship in those
States are concerned." *Paul v. Virginia*, 75 U.S. (8 Wall.)
168, 180 (1868).  In my view, the per capita approach does
not advance that goal.  The per capita formula attributes to
each resident a pro rata contribution to every program and
activity supported by a state's general fund expenditures.  But
that sort of rigid across-the-board calculation does not
accurately reflect the real benefit that a taxpayer obtains
through his or her tax dollars.  Taxpayer dollars support a
large number of state-funded programs.  Education, natural
resources management, healthcare services, corrections and
rehabilitation, infrastructure, and transportation all are at least
partially funded with state tax revenues in California.  In a
given year, an individual taxpayer likely receives no direct
benefit from some of those programs, but a benefit that far

---

[1] This illustrative example likely is a generous estimate, as the
population of California was nearly 39 million in 2014.  U.S. Census
Bureau, State & County QuickFacts, http://quickfacts.census.gov/qfd/
states/06000.html.  Thus, the permissible differential likely would be less
than $1 under the per capita formula, even though a substantial number of
California residents—for example, minor children—are not taxpayers.

exceeds his or her pro rata contribution from others. This is the deal that we make when we pay taxes: We all put a portion of our income into a big pot and it is spent in a variety of ways, some of which benefit us directly and some of which do not.

California residents subsidize each other with their taxes. For example, suppose that each taxpayer's share of state support for secondary schools is $1 per year. A certain California taxpayer has a teenager who attends public high school. That taxpayer's per capita "payment" for the educational benefit is $1, but the benefit to the taxpaying parent is worth much more than that. The parent agrees to subsidize a number of other activities in the state, including commercial fishing. In exchange, taxpayers without school-age children subsidize public education.[2] The per capita formula permits a nonresident fisher to obtain the same benefit as a resident fisher, but the nonresident does not have to subsidize *any* other programs or activities in California in exchange. The per capita formula thus *systematically disadvantages the resident* vis-à-vis the nonresident.

Instead of using a per capita formula, I would adopt the *Salorio* court's "fair share" approach. At step two of the privileges and immunities inquiry, the state must show that the discrimination against nonresidents is "closely related to

---

[2] Of course, some commercial fishers are parents whose children attend public school. But that fact just demonstrates that each taxpayer benefits directly from a different set of state programs supported by his or her tax dollars. The value of the taxpayer-funded investment in a given program to each individual taxpayer who benefits from that program varies. The value is less than the taxpayer's total tax bill, but more—generally, significantly more—than the taxpayer's strict pro rata contribution to the program.

the advancement of a substantial state interest." *Supreme Court of Va. v. Friedman*, 487 U.S. 59, 65 (1988). We recently reiterated that "[a] 'substantial reason' for discrimination does not exist 'unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed.'" *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 934 (9th Cir. 2008) (quoting *Toomer*, 334 U.S. at 398)). Nonresidents increase the amount of commercial fishing activity in California's coastal waters. That increased activity, in turn, requires the state to spend more money than it otherwise would spend on commercial fisheries management, including enforcement and conservation. Because nonresidents are a "peculiar source" of those additional costs, I would hold that not subsidizing nonresident participation in an activity funded with residents' tax dollars is a substantial reason for discrimination. *See Tangier Sound Waterman's Ass'n v. Pruitt*, 4 F.3d 264, 268 (4th Cir. 1993) (assuming, without deciding, that such an interest is permissible under the Privileges and Immunities Clause).

Turning to the "close relationship" requirement, I would hold that the State has the burden to show three things. First, it must isolate the state expenditures that benefit only the licensees.[3] *See id.* (rejecting Virginia's differential license fee in part because it unfairly charged nonresident

---

[3] These expenditures would include any costs associated with programs or activities in which only licensees participate—for example, the cost of enforcing rules such as size of fish or season limits. They also would include conservation expenditures made necessary by licensees' activities. If the state engages in conservation activities designed to keep fish stocks at a certain level, some of those activities benefit only licensees. To count those costs, the state must separate general conservation activities from conservation activities directed to the effect of commercial fishing.

commercial fishers "for programs funded by all taxpayers to benefit all fishermen, whether commercial or sport fishermen"). Second, it must determine what portion of those expenditures fairly may be characterized as deriving "from taxes which only residents pay." *Toomer*, 334 U.S. at 399; *see Tangier*, 4 F.3d at 267 (striking down Virginia's differential commercial fishing license fees in part because the state calculated the fee without considering nonresident fishers' payment of state sales and use taxes); *Salorio*, 414 A.2d at 955 (discussing whether property and sales taxes are "taxes imposed upon residents alone" in light of the fact that some nonresidents pay them). And third, it must assess what portion of qualifying expenditures is fairly allocable to the nonresidents as "the additional expenses occasioned by their activities within the state."[4] *Salorio*, 414 A.2d at 953; *see also Tangier*, 4 F.3d at 267 (holding that "the record does not disclose that the Commonwealth of Virginia has shown that it created any credible method of allocating costs as between residents and nonresidents").

I would hold that the "close relationship" requirement of step two is satisfied so long as the state charges a differential

---

[4] It may be, as the State asserts, that multiplying the qualifying expenditures by the percentage of commercial fishers who are nonresidents is the appropriate way to calculate those nonresidents' fair share, but that is not necessarily the case. *See Salorio v. Glaser*, 461 A.2d 1100, 1106 (N.J. 1983) ("Although the State has not shown that New York commuters cause higher average costs per commuter than New Jersey commuters, the New York commuter does exacerbate the peak load. Accordingly, both incremental and average costs are pertinent factors in determining the costs attributable to the New York commuter."); *Salorio*, 414 A.2d at 955 (questioning a "strict percentage computation" that assumed equal transportation costs for nonresident and resident commuters).

fee that, in the aggregate, does not exceed[5] the amount that
the state spends that (1) benefits only licensees, (2) derives
from taxes that only residents pay, and (3) is fairly allocable
to nonresidents.[6]  This test puts residents and nonresidents on
"substantially equal footing" with respect to commercial
fishing:  Residents reap the benefit of the tax dollars that they
alone pay, and nonresidents cannot be required to pay more
than their "fair share" of the benefits they enjoy that are
subsidized by those resident-paid tax dollars.

This fair share approach accurately reflects the relative
benefit that residents and nonresidents obtain from a state's
general fund expenditures.  Suppose that a state charges a $50
license fee to resident commercial fishers.  Over and above
the revenue collected from those fees, the state spends $1
million in tax-supported funds on commercial fisheries
management.  If 10,000 people per year obtain licenses, the
benefit of the $1 million subsidy to each fisher is $100.  Thus,
a nonresident may be charged the $50 fee that residents pay,
plus a $100 differential.  If only 5,000 people obtain licenses,

---

[5] Because the Privileges and Immunities Clause neither bars the
residents of a state from deciding to use their tax dollars to subsidize the
activities of nonresidents nor precludes a state from providing a greater
benefit to nonresidents than it provides to residents, it is permissible for
a state to charge *less* than the maximum allowable differential.

[6] The test here is one of "substantial equality of treatment," not absolute
equality.  *Austin v. New Hampshire*, 420 U.S. 656, 665 (1975).  So long
as the state "fairly attempts to distribute the burdens and costs of
government to those receiving its benefits" pursuant to a reasonable
methodology, I would hold that the requirements of the Privileges and
Immunities Clause are met.  *Salorio*, 414 A.2d at 952; *see also Travelers'
Ins. Co. v. Connecticut*, 185 U.S. 364, 371 (1902) ("It is enough that the
state has secured a reasonably fair distribution of burdens, and that no
intentional discrimination has been made against nonresidents.").

each nonresident may be charged a $200 differential. This variance makes sense, because the benefit to each fisher of the tax-supported outlay decreases as more people use the resource. The per capita approach makes less sense because it is unresponsive to such changes; so long as a state's tax rate and general fund outlay on the commercial fisheries program remain unchanged, the permissible differential is fixed. It is the same whether 10 or 10,000 people obtain licenses and use the resource.

Plaintiffs raise the specter of a year in which only one nonresident purchases a commercial fishing license. They argue that the state's approach would permit California to collect hundreds of thousands of dollars from that single licensee. Not so. The fair share formula accounts for this possibility. Assuming the scenario described above, in a year in which a single nonresident and 4,999 residents obtain licenses the permissible differential for that nonresident would remain $200.[7]

Finally, Plaintiffs challenge the "fair share" approach because, using it, the state could set nonresident license fees ten, twenty, or even a hundred times higher than resident license fees. They point out that the Supreme Court has rejected nonresident fees at such ratios before. *See Mullaney*, 342 U.S. at 418 (invalidating nonresident fees ten times

---

[7] The only way the permissible differential charged to a nonresident would skyrocket is if the overall number of fishers obtaining licenses plunged to single digits. But if that happened, the state likely would slash its commercial fisheries management spending. And if it did not cut spending, it is hard to see how the State could prove that the full $1 million in my example benefitted just a handful of fishers, because it is not reasonable to attribute hundreds of thousands of dollars in enforcement and conservation costs to a single fisher.

higher than resident fees); *Toomer*, 334 U.S. at 389 (striking down nonresident fees one hundred times higher than resident fees). And they urge us to rely on the ratio of nonresident to resident fees here (roughly three to one)[8] to reject the "fair share" analysis. Plaintiffs' argument is flawed for two reasons.

First, the Supreme Court did not reject the differential fees because of the *size* of the ratio. Rather, it rejected the nonresident fees because Alaska and South Carolina had failed to show any *connection* between the differential and state spending on services to the nonresidents. *See Mullaney*, 342 U.S. at 418 & n.1 (rejecting the state's argument that the differential fees merely compensated the state for enforcement against nonresidents because the state had not calculated the cost of that enforcement and the total amount of differential fees collected "may easily have exceeded the entire amount available for administration" of the office in charge of enforcement); *Toomer*, 334 U.S. at 398 (noting that "[n]othing in the record indicate[d] . . . that any substantial amount of the State's general funds [was] devoted to shrimp conservation" and that, even if there had been such evidence, it "would not necessarily support a remedy so drastic as to be a near equivalent of total exclusion").

Second, focusing on the size of the ratio requires consideration of fees in a vacuum. That isolation makes little sense in light of the Supreme Court's statement that a state may charge a fee designed to "compensate [it] for any added

---

[8] The ratio of nonresident fees to resident fees for commercial fishing licenses and commercial boat registrations is three to one. For dungeness crab vessel permits, the ratio is lower (two to one); and for herring gill net permits, the ratio is higher (nearly four to one).

enforcement burden [nonresidents] may impose or for any conservation expenditures from taxes which only residents pay." *Toomer*, 334 U.S. at 399. In *Salorio*, the tax at issue applied *only* to nonresidents. On appeal after remand, the New Jersey Supreme Court ultimately invalidated the tax—but not because the nonresident-to-resident ratio was too high. The problem was that, during a period of two decades, the revenues collected by the state through the tax had exceeded the costs attributable to nonresidents by a factor of more than two. *Salorio v. Glaser*, 461 A.2d 1100, 1107 (N.J. 1983). Focus on the size of the ratio per se is misplaced; the privileges and immunities inquiry requires consideration of all taxes and fees paid by residents and nonresidents in support of commercial fishing.

Because it applied a different test, the district court did not address whether the net general fund outlay benefits only licensees, whether that outlay derives solely from taxes that only residents pay, or what portion of qualifying costs is properly allocable to nonresident fishers. Thus, on the current record, I would hold that we cannot determine whether the differential fees are permissible under the Privileges and Immunities Clause. Accordingly, I would reverse the summary judgment of the district court and remand for further proceedings.