Dissent by Judge MILAN D. SMITH, Jr.
Dissent by Judge REINHARDT
OPINION
W. FLETCHER, Circuit Judge:
California charges nonresident commercial fishers higher fees for vessel registrations, licenses, and permits than it charges resident commercial fishers. A certified class of nonresident commercial fishers challenges the fee differentials under the Privileges and Immunities Clause and the Equal Protection Clause. We hold that California’s fee differentials do not violate either clause.
I. Background
California requires both resident and nonresident commercial fishers to register their vessels and to purchase licenses and permits in order to engage in commercial fishing in the waters of the state. See Cal. Fish & Game Code §§ 7852, 7881 (2013). Fbr many years, California has mah'aged its commercial fishery at a substantial loss. See Cal. Fish & Game Code- §§ 710.5(a), 710.7(a)(1) (2007). In Fiscal Year (FY) 2010-11, the year for which we have the most extensive documentation in the record, California’s Department of Fish and Game spent approximately $20 million managing its commercial fishery. In the same year, California received approximately $5.8 million in fees—including registration, license, and permit fees paid by residents and nonresidents—from participants in its commercial fishing industry. The approximately $14 million shortfall was covered by California’s general tax revenues.
California has statutorily mandated fees for commercial fishing vessel registrations, licenses, and permits. See Cal. Fish & Game Code §§ 713, 7852, 7881, 8280.6, 8550.5. Fees are adjusted annually based *845 on inflation. Beginning in 1986, California charged nonresidents more than residents for certain commercial fishing registrations, licenses, and permits. In 1986, California for the first time charged nonresidents more than residents for herring gill net permits. In 1993, California for the first time charged nonresidents more for commercial fishing vessel registrations and commercial fishing licenses. In 1995, California for the first time charged nonresidents more for Dungeness crab .permits.
In license year 2010, the fees for resident and nonresident commercial fishers were as follows:
Commercial fishing vessel registration:
Resident: $817.00
Nonresident: $951.50
Commercial fishing license:
Resident: $120.75
Nonresident: $361.75
Dungeness crab vessel permits:
Resident: $254.00
Nonresident: $507.50
Herring gill net permits:
Resident: $336.00
Nonresident: $1,269.00
Cal. Dep’t Fish & Game, Digest of California Commercial Fishing Laws and Licensing Requirements (2010). Dungeness crab and herring were (and are) limited entry fisheries for which a limited number of permits was (and is) available.
Depending on the activity in question, a commercial fisher in California could be required to pay several fees. For example, a fishing vessel owner who personally engaged in fishing for herring was required to pay a vessel- registration fee, a commercial fishing license fee, and a herring gill net permit fee. For a California resident holding a single permit, the total cost in 2010 would have been $773.75. For a nonresident, the total cost would have been $2,582.25, or 3.3 times as much as for a resident. A vessel owner who personally engaged in fishing for Dungeness crab was required to pay a vessel registration fee, a commercial fishing license fee, and a Dungeness crab permit fee. For a California resident, the total cost in 2010 would have been $691.75; for a nonresident, the total cost would have been $1,820.75, or 2.6 times as much as for a resident. Of the approximately $5.8 million in fees paid to California in FY 2010-11 by the commercial fishing industry, approximately $435,000 came from fee differentials paid by nonresidents.
Plaintiffs, a class of nonresident commercial fishers, challenge the four nonresident fee differentials—for commercial fishing vessel registrations, commercial fishing licenses, Dungeness crab permits, and herring gill net permits. Plaintiffs brought a class action in district court against California’s Director of the Department of Fish and Game (for convenience, “California”), challenging the fee differentials as violating the dormant Commerce Clause, the Privileges and Immunities Clause, and the Equal Protection Clause. Plaintiffs voluntarily dismissed their dormant commerce clause claim. The parties filed cross-motions for summary judgment on the remaining two claims. The district court ruled for the plaintiff class on its privileges and immunities claim, did not reach its equal protection claim, and entered judgment under Federal Rule of Civil Procedure 54(b). California appealed the grant of Plaintiffs’ motion .for summary judgment and the- denial of its own motion for summary judgment. A divided three-judge panel of this court affirmed. Marilley v. Bonham, 802 F.3d 958 (9th Cir. 2015). We granted rehearing en banc. Marilley v. Bonham, 815 F.3d 1178 (9th Cir. 2016).
For the reasons that follow, we reverse the grant of summary judgment to Plain *846 tiffs. We remand with directions to grant summary judgment to California.
II. Standard of Review
We reviéw de novo a district court’s decision granting or denying a motion for summary judgment. Rocky Mountain Farmers Union v. Corey, 730 F.3d 1070, 1086 (9th Cir. 2013).
III. Discussion
A. Privileges and Immunities
Article IV, Section 2, clause 1, of the Constitution provides that “[t]he- Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.” The Clause’s "primary purpose ... was to help fuse into one Nation a collection of independent, sovereign States.” Toomer v. Witsell, 334 U.S. 386, 395, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). The Clause “establishes a norm of comity” between citizens of separate states. Austin v. New Hampshire, 420 U.S. 656, 660, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975).
A challenge under the Privileges and'Immunities Clause entails “a two-step inquiry.” Sup. Ct. of Va. v. Friedman, 487 U.S. 59, 64, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988); United Bldg. and Constr. Trades Council v. Camden, 465 U.S. 208, 218, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984); see also Council of Ins. Agents & Brokers v. Molasky-Arman, 522 F.3d 925, 934 (9th Cir. 2008). At step one, the plaintiff bears the burden of showing that the challenged law “fall[sj within the purview of the Privileges and Immunities Clause.” Friedman, 487 U.S. at 64, 108 S.Ct. 2260 (quoting Camden, 465 U.S. at 221-22, 104 S.Ct. 1020); see also Schoenefeld v. Schneiderman, 821 F.3d 273, 279 (2d Cir. 2016) (quoting Friedman, 487 U.S. at 64, 108 S.Ct. 2260). If the plaintiff makes the required step-one showing, at step two the burden shifts to the state to show that the challenged law is “closely: related to the advancement of a substantial state interest.” Friedman, 487 U.S. at 65, 108 S.Ct. 2260 (citing Sup. Ct. of N.H. v. Piper, 470 U.S. 274, 284, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985)); see also Schoenefeld, 821 F.3d at 279 (quoting Friedman, 487 U.S. at 67, 108 S.Ct. 2260).
We address these two steps in turn.
1. Purview of the Clause
The “threshold matter” in any Privileges and Immunities Clause case is whether a challenged law “fall[s] within the purview” of the Clause. Camden, 465 U.S. at 218, 104 S.Ct. 1020 (quoting Baldwin v. Mont. Fish & Game Comm’n, 436 U.S. 371, 388, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978)). A plaintiff must show that the challenged law treats nonresidents differently from residents and impinges upon a “fundamental” privilege or immunity protected by the Clause. Camden, 465 U.S. at 218, 104 S.Ct. 1020. Because California charges higher fees to nonresident commercial fishers, see Cal. Fish & Game Code §§ 7852, 7881, 8280.6, 8550.5, we easily conclude that Plaintiffs’ interests are “facially burdened.” McBurney v. Young, — U.S. -, 133 S.Ct. 1709, 1715, 185 L.Ed.2d 758 (2013); see also Hillside Dairy Inc. v. Lyons, 539 U.S. 59, 66-67, 123 S.Ct. 2142, 156 L.Ed.2d 54 (2003); Carlson v. State, 798 P.2d 1269, 1274 (Alaska 1990) (“[License fees which discriminate against nonresidents sere-prima facie a violation of [the Privileges and Immunities Clause].”). Further, an unbroken line of authority characterizes commercial fishing as a “common calling” that is protected by.the Privileges and Immunities. Clause. See Mullaney v. Anderson, 342 U.S. 415, 417-19, 72 S.Ct. 428, 96 L.Ed. 458 (1952) (striking down Alaska’s differentials for commercial fishing licenses as *847 violating the Privileges and Immunities Clause); Toomer, 334 U.S. at 403, 68 S.Ct. 1156 (“[Commercial shrimping in the marginal sea, like other common callings, is within the purview of the privileges and immunities clause.”); Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84, 96 (2d Cir. 2003) (holding that “commercial lob-stering” falls within the purview of the Privileges and Immunities Clause); Tangier Sound Waterman’s Ass’n v. Pruitt, 4 F.3d 264, 266 (4th Cir. 1993) (explaining that commercial fishing is a “protected privilege” because it implicates “ ‘the right to earn a living”’ (quoting Toomer, 334 U.S. at 403, 68 S.Ct. 1156)); Carlson, 798 P.2d at 1274 (“Commercial fishing is a sufficiently important activity to come within the purview of the Privileges and Immunities Clause.”).
We therefore conclude that California’s challenged fee differentials fall within the purview of the Privileges and Immunities Clause.
2. Closely Related to the Advancement of a Substantial State Interest
a. Commercial Fishing Fees • and State Subsidy
California’s differential fees for nonresident fishers have not'reduced the percentage of nonresidents obtaining permits. In license year 1986, the year differential fees were introduced for herring gill net permits, nonresidents held 17.5% of these permits in California. In license year 2012, the most recent year for which we have information in the record, nonresidénts' held 19% of these permits. In license year 1993, the year differential fees were introduced for commercial fishing vessel registrations and commercial fishing licenses, nonresident commercial fishers held 7.2% of all commercial fishing vessel registrations and 6.6% of all commercial fishing licenses in California. In license year 2012, nonresident commercial fishers registered 9.4% of all commercial fishing vessel registrations and 12,9% of all commercial fishing licenses in California. In license year 1995, the year differential fees were charged for Dungeness crab permits, nonresidents held 9;8% of these permits. In license year 2012, nonresidents held 13.9% of these permits.
According to a declaration of Tony War-rington, Assistant Chief of the Law Enforcement Division of California’s Department' of Fish and Game (“DFG”) (now the Department of Fish and Wildlife), a “reasonable and conservative estimate” of commercial fishing enforcement expenditures by the Law Enforcement Division in FY 2010-11 is $10,320,963. According to a declaration of Helen Carriker, Deputy Director of Administration of DFG, additional FY 2010-11 expenditures by the License and Revenue Branch of DFG and by the Marine Region of DFG were $9,499,000. Carriker states, however, that these numbers do “not capture all of DFG’s commercial fishing costs,” and that “all DFG programs benefit commercial fishermen in some way.” These numbers also do not include fishing-related conservation expenditures by other California agencies, such as the California Coastal Commission. Based on the numbers provided by Warrington and Carriker, a conservative estimate is that California spent approximately $20,000,000 in FY 2010-11 on enforcement, management, and conservation activities benefitting commercial fishers.
Warrington estimated the FY 2010-11 expenditures by the Law Enforcement Division of DFG attributable to the Dungeness crab fishery as $921,394, and attributable to the herring gill net fishery as $75,094, He noted, however, that these numbers “likely underestimate the enforcement costs for these two fisheries” *848 because not all personnel costs (in terms of both numbers of people and numbers of overtime hours) were included, and because some equipment expenses were not included. Carriker estimated the FY 2010-11 expenditures by the License and Revenue Branch of DFG attributable to the Dungeness crab fishery as $83,921, and attributable to the herring gill net fishery as $97,431. According to a declaration by Martí Yaremko, Environmental Program Manager for DFG, FY 2010-11 expenditures by the Marine Region of DFG attributable to the Dungeness crab fishery were “at least” $109,797, and attributable to the herring gill net fishery were “at least” $285,981. Combining the expenditures by the Law Enforcement Division, the License and Revenue Branch, and the Marine Region, in FY 2010-11 California’s DFG spent at least $1,115,112 attributable to the Dungeness crab fishery and at least $458,506 attributable to the herring gill net fishery.
During FY 2010-11, California residents registered 2,812 commercial fishing vessels; nonresidents registered 304 vessels. Nonresidents’ vessels thus accounted for approximately 10% of the total registrations in that year. California residents purchased 5,618 commercial fishing licenses; nonresidents purchased 775 licenses. Nonresidents accounted for approximately 12% of the total licenses. California residents paid the yearly fee for 500 Dungeness crab permits; nonresidents paid the fee for 76 permits. Nonresidents accounted for approximately 13% of the total Dungeness crab permits. California residents paid the yearly fee for 180 herring gill net permits; nonresidents paid the fee for 39 permits. Nonresidents accounted for approximately 18% of the total herring gill net permits.
During FY 2010-11, California received, from residents and nonresidents, a total of approximately $2,415,000 for commercial vessel registrations, commercial fishing licenses, Dungeness crab permits, and herring gill net permits. Of that amount, approximately $435,000 was due to fee differentials paid by nonresident fishers. Broken down by category, the fee differentials were approximately $193,000 for commercial fishing boat registrations; approximately $187,000 for commercial fishing licenses; approximately $19,000 for Dungeness crab permits; and approximately $36,000 for herring gill net permits.
Overall, during FY 2010-11 California received approximately $5,800,000 in commercial fishing revenues, including revenues from resident and nonresident fishing vessel registrations, fishing licenses, Dungeness crab permits, and herring gill net permits. Using $20,000,000 as the conservative estimate of California’s overall commercial fishery expenditures, the FY 2010-11 shortfall was slightly over $14,000,000. If we exclude from the calculation fee differentials paid by nonresidents, the shortfall in FY 2010-11 was approximately $14,435,000. The shortfall was covered by California’s general tax revenues. This shortfall was a subsidy, or benefit, provided by California taxpayers to the commercial fishing industry in California. The question before us is whether, or to what degree, nonresident commercial fishers may be required to pay differential fees to account for their proportionate share of that subsidy, or benefit.
b. Advancement of a Substantive State Interest
i. State Expenditures and Compensation by Nonresidents
(a) State Expenditures
The Supreme Court has decided two cases in which differential fees were charged to nonresident commercial fishers. *849 First, in Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), South Carolina charged a license fee of $25 for commercial shrimp boats owned by state residents. It charged a license fee of $2,500—one hundred times greater—to commercial shrimp boats owned by nonresidents. Id. at 389, 68 S.Ct. 1156. The Court wrote that “South Carolina plainly and frankly discriminates against non-residents, and the record leaves little doubt but what the discrimination is so great that its practical effect is virtually exclusionary.” Id. at 396-97, 68 S.Ct. 1156; see also id. at 398, 68 S.Ct. 1156 (noting “a near equivalent of total exclusion”). The Court struck down the fee differential as a violation of the Privileges and Immunities Clause. Id. at 403, 68 S.Ct. 1156. The Court was careful, however, to endorse differential fees that were compensation or reimbursement for state-provided benefits as to which nonresidents would otherwise be free riders. The Court wrote that the Clause allows a state “to charge nonresidents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay.” Id. at 399, 68 S.Ct. 1156.
Second, in Mullaney v. Anderson, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952), the Tax Commissioner of Alaska charged a commercial fishing license fee of $5 to residents and a $50 fee—a ten times greater fee—to nonresidents. Alaska sought to justify the fee differential based on enforcement costs attributable to nonresident commercial fishers, but the record did not support its attempted justification. Indeed, wrote the Court, the Tax Commissioner and his Deputy “specifically disclaimed any knowledge of the dollar cost of enforcement.” Id. at 418, 72 S.Ct. 428. Applying the Privileges and Immunities Clause to a Territory (as Alaska then was), the Court struck down the fee differential. The Court quoted the language from Toomer endorsing differential fees that prevent nonresidents from free riding on state-provided enforcement and conservation efforts, id. at 417, 72 S.Ct. 428, and the Court was careful to say that precise cost and reimbursement figures were not required in order to justify differential fees, id. at 418, 72 S.Ct. 428 (“Constitutional issues affecting taxation do not turn on even approximate mathematical determinations.”).
To justify the fee differentials challenged in this ease, California points to the approximately $14 million yearly shortfall in its expenditures in managing its commercial fishery. As noted above, without the revenue produced by the fee differentials, the yearly shortfall would be an additional $435,000. California contends that the fee differentials charged to nonresident commercial fishers appropriately compensate it for costs incurred in enforcement and conservation efforts attributable to nonresidents as their proportionate share, and that the fee differentials reduce (though do not entirely eliminate) the free-rider problem that would otherwise exist.
On several occasions, the Supreme Court has stated that a state’s expenditures may justify discrimination against nonresidents that would otherwise be impermissible under the Privileges and Immunities Clause. As just noted, the Court stated in Toomer and Mullaney that a state may charge differential fees to nonresident commercial fishers in order to recover the state’s expenditures in enforcement and conservation measures that are attributable to the nonresidents. In Camden, a municipal ordinance required that at least forty percent of workers employed on city construction projects be residents of Camden, New Jersey. The Court *850 wrote, “The fact that Camden is expending its own funds or funds it administers in ... terms of a grant is certainly a factor— perhaps the crucial factor—to be considered in evaluating whether the statute’s discrimination violates the Privileges and Immunities Clause.” Camden, 465 U.S. at 221, 104 S.Ct. 1020.
The Court’s decisions under the Commerce Clause make much the same point about state expenditures. Commerce Clause decisions are relevant to the Privileges and Immunities Clause because the two clauses share the same underlying concerns. See, e.g., Hicklin v. Orbeck, 437 U.S. 518, 531-32, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978) (“[T]he mutually reinforcing relationship between the Privileges and Immunities Clause ... and the Commerce Clapse.—a relationship that stems from their common origin in the Fourth Article of the Articles of Confederation and their shared vision of federalism ...—renders several Commerce Clause decisions appropriate support for our conclusion [under the Privileges and Immunities Clause].” (internal citation omitted)). In Reeves, Inc. v. Stake, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), South Dakota built and owned its own cement plant. When demand for cement exceeded supply, South Dakota instituted a policy of satisfying all orders from South Dakota customers first, relegating out-of-state customers to the end of the line. The Court sustained the policy against a dormant Commerce Clause challenge, writing:
The State’s refusal to sell to buyers other than South Dakotans is “protectionist” only in the sense that it limits benefits generated -by a state program to those who fund the state treasury and whom the State was created to serve.... Such policies, while perhaps “protectionist” in a loose sense, reflect the essential and patently unobjectionable purpose of state government—to serve the citizens of the State.'
Id. at 442, 100 S.Ct. 2271. Similarly, in McBurney v. Young, — U.S. —, 133 S.Ct. 1709, 185 L.Ed.2d 758 (2013), the Supreme Court rejected a dormant Commerce Clause challenge to a Virginia Freedom of Information Act provision under which only Virginia residents were allowed to compel production of state government documents. Citing Reeves, the Court wrote, “Insofar as there is a ‘market’ for public documents in Virginia, it is a market for a product that the Commonwealth has created and of which the Commonwealth is the sole manufacturer.” Id. at 1720. The Court therefore held that Virginia could reserve for its citizens the benefits of the product it had created through the expenditure of state funds.
(b) Compensation by Nonresidents for State-provided Benefits
The core principle of the foregoing cases is that when a state makes an expenditure from a fund to which nonresidents do not contribute, and when the state provides a benefit through that expenditure to both residents and nonresidents, the state may exclude nonresidents from the benefit either in whole or in part, or it may seek compensation from nonresidents for the benefit conferred. When the benefit at issue is access to a natural resource, the state may not exclude nonresidents, but it may seek reimbursement for money spent to manage and preserve the resource. In such cases, as the Court wrote in Toomer, the Privileges and Immunities Clause allows a state “to charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay.” Toomer, 334 U.S. at 399, 68 S.Ct. 1156.
*851 Several related principles come from these same cases. First, the benefit provided to a nonresident, and the appropriate amount of compensation from the nonresident, need not be determined with mathematical precision. The constitutional question “do[es] not turn on even approximate mathematical determinations.” Mullaney, 342 U.S. at 418, 72 S.Ct. 428. Second, we accord states deference in determining the benefit provided and the appropriate amount of compensation. A privileges and immunities inquiry “must ... be conducted with due regard for the principle] that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures.” Toomer, 334 U.S. at 396, 68 S.Ct. 1166. Third, in seeking compensation from nonresidents, a state must treat nonresidents and residents with “substantial equality.” Id. at 396, 68 S.Ct. 1156 (“[I]t was long ago decided that one of the privileges which the [Privileges and Immunities Clause] guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State.”).
Consistent with these principles, we may calculate at a general level the benefit provided by California and the appropriate compensation from nonresident fishers. California spent approximately $20,000,000 managing its commercial fishing industry in FY 2010-11. Not including the fee differentials paid by nonresident fishers, California received a total amount of approximately $5,365,000 in fees from the commercial- fishing industry.- This amount includes- all fees, not limited to commercial fishing license fees, commercial fishing vessel registration fees, Dungeness crab permits, and herring gill net permits. Of that total amount (again- excluding the amount paid in fee differentials), approximately $1,980,000 came from registration, license, and permit fees paid by commercial fishers. The remaining approximately $3,385,000 came from fish landing taxes and from licensing fees paid by fish buyers, sellers, and importers. The shortfall in revenues (excluding nonresident differentials) in FY 2010-11 was approximately $14,635,000, or approximately 73% of the entire amount spent by California in managing its commercial fishery. The shortfall was a subsidy, or benefit, provided by California to its commercial fishing industry, paid by California taxpayers. All commercial fishers in California— residents and nonresidents alike—benefited from this subsidy.
We will assume, as a rough estimate, that commercial fishers as a whole benefited from the states’ subsidy in proportion to the amount they paid in fees. Excluding fee differentials, the amount paid to California by commercial fishers ($1,980,000) was 37% of the total amount paid to California by the entire commercial fishing industry ($5,365,000). Thirty-seven percent of the state’s $14,635,000 subsidy is approximately $5,341,000. That amount went to commercial fishers as their proportionate share of the subsidy in FY 2010-11. Nonresident commercial fishers in California were 12% of all commercial fishers in FY 2010-11. Twelve percent of the $5,341,000 subsidy -that went to all commercial fishers is approximately $641,000. •California could have charged up to that amount to nonresident fishers in FY 2010-11, as their proportionate share of the subsidy, or benefit, provided to them by California out of its general fund. In actual fact, nonresident fishers paid a total of $435,000 in fee differentials in FY 2010-11, substantially less than the amount of their proportionate share of the subsidy, or benefit, provided to them by California.
We may- also calculate the 'subsidies provided to the two specific fisheries for which *852 California charges fee differentials— Dungeness crab and herring. As described above, in FY 2010-11 California’s DFG spent approximately $1,115,000 attributable to the Dungeness crab fishery and approximately $460,000 attributable to the herring fishery. As noted above, the overall subsidy provided by California to its commercial fishery is 73% of California’s total expenditures for managing its commercial fishery. We will assume, as a .rough estimate, that 73% of the amount spent on the Dungeness crab and herring fisheries is the amount by which those specific fisheries were subsidized in FY 2010-11.
Seventy-toee percent of the subsidy provided to the Dungeness crab fishery is approximately $814,000. Nonresidents were 13% of the Dungeness crab permit holders in FY 2010-11. Thirteen percent of $814,000 is approximately $106,000, which is the proportionate share of the subsidy provided to nonresident Dungeness crab fishers in FY 2010-11. The differential fee charged to nonresident Dungeness crab fishers in FY 2010-11 was approximately $19,000, substantially less than the $106,000 subsidy, or benefit, provided to them.
Seventy-three percent of the subsidy provided to the herring fishery is approximately $335,000. Nonresidents were 18% of the herring gill net permit holders in FY 2010-11. Eighteen percent of $335,000 is approximately $60,000. The differential fee charged to nonresident herring gill net fishers in FY 2010-11 was $36,000, substantially less than the $60,000 subsidy, or benefit; provided to them.
Thus, whether the calculation is made at the general level of all nonresident commercial fishers, or at the specific level of nonresident commercial fishers for Dungeness crab and herring, the fee differentials charged by California are less' than the amount by which California subsidizes the management of the nonresidents’ portions of its commercial fishery.
In contrast to the fee differential charged in Toomer, California commercial fishing differentials are not “virtually exclusionary.” Toomer, 334 U.S. at 397, 68 S.Ct. 1156. Indeed, quite the contrary. As the numbers given above demonstrate, the percentages of nonresident fishing vessel registrations, nonresident commercial fishing licenses, nonresident Dungeness crab permits, and nonresident herring gill net permits have all increased since the institution of differential fees for nonresidents. Further, in contrast to the fee differentials in Toomer and Múllaney, the multiples of the fees charged to residents are relatively modest. In Toomer, South Carolina charged nonresident shrimpers one hundred times what it charged residents. In Mullaney, Alaska charged nonresident fishers ten times what it charged residents. In California, the multiples ranged from about two to slightly less than four.
We therefore conclude that the fee differentials charged by California are permitted under the Privileges and Immunities Clause.
ii. California Taxes Paid by Nonresident Fishers
The above analysis is premised on the nonresident fishers in this case not having paid “taxes which only [California] residents pay.” Toomer, 334 U.S. at 399, 68 S.Ct. 1156. Plaintiffs did not argue in the district court or in their briefs, to us that they have paid California income tax on their earnings from commercial fishing in California, and that they are therefore protected by the Privileges and Immunities Clause from having to pay fee differentials. Plaintiffs made this argument for the first time during oral argument before our en banc panel. Our dissenting colleagues use *853 Plaintiffs’ late-raised argument as the central rationale of their dissent. We could hold Plaintiffs’ argument waived for failure to raise it in the district court and for failure to raise' it in their briefs to us. However, we address it on the merits, for there is enough uncontested information in the record to allow us to consider and reject it. Because we reject the argument, there is no unfairness to California resulting from Plaintiffs’ failure to raise it until oral argument before our en banc panel.
If Plaintiffs paid more than de minimus income tax to California, such that they should be assimilated, either entirely or in part, to California resident taxpayers for purposes of the Privileges and Immunities Clause, we would have to modify our analysis. However, we do not need to do so because the three named plaintiffs have paid either no or minimal California income tax. One of the named plaintiffs has fished commercially in California for'many years and has never paid California income tax. The other two named plaintiffs have fished commercially in California for many years; each has paid income taxes in Cali-forma for only three of those years.
Named plaintiff Savior Papetti lives in McKinney, Texas. He owns two commercial fishing boats. He uses one of them to fish in Alaska. He has kept the other boat in San Francisco since 2000. He does not own any herring gill net permits, but has fished regularly for herring in California, missing only a few years, by leasing permits from others. He has fished for Dungeness crab regularly since 2006 except for a “couple [of] years.” He stated in his deposition that he has filed 'California tax returns “every year.” He specifically stated that he has not paid California income tax since 1992. There is nothing in the record to indicate that he paid California income taxes before 1992.
Named plaintiff Salvatore Papetti, Savior’s father, fives in Bellingham, Washington. He states in his deposition that he has worked as a commercial fisherman since 1963. He owns two commercial fishing boats. He keeps one of them in Alaska. He now uses it to fish for salmon, but in the past has used it to fish for Dungeness crab and herring in California. At the time of his deposition, his other boat was in Washington for repairs. He uses that boat to fish for herring in Alaska and in California, and for salmon in Washington. He fished for Dungeness crab in California as late as 2007. About five or six years ago, he sold his crab permit to his son Savior. He has never missed a herring season in California except the year the season was closed due to an oil spill in San Francisco Bay. He has filed California income tax returns “every year,” but has paid income taxes to California in only three of those years. He paid $381 in 2004, $652 in 2009, and $2,273 in 2010.
Finally, named plaintiff Kevin Marilley fives in Lynden, Washington. He has worked as a commercial fisherman since 1974. He owns three commercial fishing boats. He keeps two in Alaska and uses them to fish there. He keeps the third boat in Bellingham, Washington, and uses it to fish for salmon in Alaska and herring in California. He fished for squid and herring in California between 1989 and 2005, and fished for squid in California in 2009. He regularly fished for herring in California through 2007. He stated in his deposition that he intended to fish for herring in California in 2013. He stated in his deposition that he “befieve[d]” he filed a California tax return for every year he fished in California up through 2003. The last time he filed a tax' return in California was 2003. He paid income tax in California in only three years. He paid $153 in 1994, $3,161 in 1995, and $845 in 1996. He last *854 paid California income tax twenty years ago.
Our dissenting colleagues do not ask to alter our analysis based on the non-existent or minimal California income taxes paid by the three named plaintiffs. Rather, they ask us to do so based on an unsupported assumption that unnamed class members paid substantially more in California income taxes than did the named plaintiffs.
The record contains no evidence of California income taxes paid by any of the unnamed class members. Attorneys for the plaintiff class had an opportunity in the district court to present evidence of California income taxes paid by unnamed class members, but they failed to present any such evidence. Nor did they make any argument in the district court based on payment of California income taxes by any class member, named or unnamed. An assumption that unnamed class members paid substantially more than the named plaintiffs is inconsistent with the basic premises of class certification. Federal Rule of Civil Procedure 23(a)(3) requires that the “claims .,. of the representative parties [be] typical of the claims ... of the class.” That is, .a- claim by an unnamed member of the class must match a “typical” claim by a named plaintiff. In this case, there is no such “typical” claim in the complaint because the named plaintiffs made no claim whatsoever based on their payment of California income taxes. Rule 23(a)(2) also requires that there be “questions of law or fact common to the class.” If a claim based on the payment of California income taxes had been made in the district court (which it was not), that claim was required to have been based on law or fact “common to the class,” To the extent there were facts common to such a claim, if it had been made, the only facts in evidence were those recounted above.
In short, our dissenting colleagues ask us to make an assumption, based on sheer speculation, that unnamed class members paid substantially more in California income taxes than did the named plaintiffs. We respectfully decline to make that assumption.
B. Equal Protection
Plaintiffs also challenged California’s, commercial fishing fee differentials under the Equal .Protection Clause. The district court struck down the fee differentials as a violation of the Privileges and Immunities Clause and did not reach the equal protection question. We could remand to the district court to áddress that question in the first instance, but in the interest of judicial efficiency we decide the question ourselves.
Because California’s commercial fishing fee differentials do not “classify persons based on protected characteristics, such as race, alienage, national origin, or sex” or “affect the exercise of fundamental rights,” rational basis review applies. Fields v. Legacy Health Sys., 413 F.3d 943, 955 (9th Cir. 2005); see also Country Classic Dairies, Inc. v. State of Mont., Dep’t of Commerce Milk Control Bureau, 847 F.2d 593, 596 (9th Cir. 1988) (“[T]he right to pursue a calling is not a fundamental right for purposes of the Equal Protection Clause.” (citing New Orleans v. Dukes, 427 U.S. 297, 303-05, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam))); see also Medeiros v. Vincent, 431 F.3d 25, 32 (1st Cir. 2005) (“The right to ‘make a living’ is not a ‘fundamental right,’ for either equal protection or substantive due process purposes.”). Therefore, in order to succeed Plaintiffs must “negat[e] every conceivable basis which might support the legislative classification” between residents and nonresidents. Fields, 413 F.3d at 955. As explained above, California has a “sub *855 stantial reason” for charging nonresident differentials. It has an obvious interest in recovering from nonresident commercial fishers their share of the benefit provided to them by its management, of its commercial fishery. Congress has recognized this interest as legitimate. See Pub. L. No. 109-13, § 6036(b)(1), 119 Stat. 231. But even absent such congressional endorsement, California’s interest in receiving compensation for the benefit its management confers provides a “rational basis” for its fee differentials.
Conclusion
We reverse the district court’s grant of summary judgment to Plaintiffs. California’s fee differentials for commercial fishing vessel registrations, fishing licenses, Dungeness crab permits, and herring gill net permits survive the Privileges and Immunities Clause challenge because the differentials are justified by a substantial reason that is closely related to the differential fees. The fees survive the Equal Protection Clause challenge because California has a rational basis for charging the differential fees. California is therefore entitled to summary judgment on both of Plaintiffs’ "claims. We remand with directions to the district court to enter summary judgment for California.
REVERSED and REMANDED.